JOSEPH FEDANZO, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—01—0582

Opinion filed August 2, 2002.

Beranek & DeWilkins, of Orland Park (Donald W. DeWilkins, of counsel), for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Erica M. Landsberg, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff Joseph Fedanzo filed a petition for writ of *certiorari* in the circuit court seeking review of the recommendation and decision of the Personnel Board of the City of Chicago (Personnel Board) and the City of Chicago (City) to terminate him from his employment with the City. The trial court denied the petition. On appeal, plaintiff seeks reinstatement, contending: (1) that the Chicago residency requirement is unconstitutional; (2) that the decision of the Personnel Board was against the manifest weight of the evidence; and (3) that the hearing officer erred in denying his motions to suppress evidence. For the reasons set forth below, we affirm the judgment of the trial court.

## BACKGROUND

In early 1991, plaintiff accepted a position with the City's department of water. He later worked as an electrical mechanic with the City's department of aviation at O'Hare International Airport (O'Hare). In a change of address form completed on July 3, 1996, plaintiff changed his Chicago address from 5371 North Delphia to 4623 North Chester Avenue. Acting on an anonymous tip it received in November 1997, the City's inspector general's office (IGO) began an investigation into plaintiff''s residency. This investigation ultimately led to plaintiff's termination from his employment with the City effective April 12, 1999. This action was based upon plaintiff's violation of various personnel rules, all relating to his failure to actually reside in the City. Plaintiff sought a hearing on the termination decision.

Prior to his hearing, plaintiff filed a motion to suppress statements he made to investigators, claiming provisions of his union collective bargaining agreement had been violated. He also filed a motion to suppress all evidence gathered after six months from when the IGO's investigation began, based upon its failure to inform the mayor, as required by City ordinance, of the continued investigation. Additionally, plaintiff filed a motion to vacate the City's order terminating him on the ground the residency requirement violated his

procedural and substantive due process rights as guaranteed by the United States and Illinois Constitutions. All of these motions were denied.

At the hearing, Daniel Hintz testified that he was the lead investigator with the IGO on plaintiff's residency case. Based upon the most recent address information plaintiff had provided, his address was 4623 North Chester Avenue, unit 108W, which is a one-bedroom condominium owned by plaintiff. The Chester Avenue condominium was part of four buildings, each covering a city block, and surrounded by Chester, Commons, Leland and Wilson. On December 3, 1997, February 18, March 20, April 3, April 13 and June 1, 1998, Hintz conducted surveillance on plaintiff's Chester Avenue address, with each beginning about 2:30 a.m. and ending around 7 a.m. Plaintiff was usually scheduled to be at work by 7 a.m. Hintz did not observe plaintiff during any of his surveillances. On cross-examination, Hintz testified that because there were multiple entrances into the buildings, he was unable to see them all at once and admitted that plaintiff could have left the property without being seen by Hintz.

When Hintz called the telephone number registered to the Chester Avenue address on October 30, 1998, an answering machine with a female voice picked up, stating that the "Donoho residence" had been reached. On November 25, 1998, when Hintz called the number again, the answering machine, still in a female voice, stated that the "Fedanzo/Donoho residence" had been reached.

Between June and September 1998, Hintz conducted surveillance numerous times on 248 North Harvard Street, a single-family home, in Villa Park, Illinois, owned by plaintiff, his wife Natalie, and his father. In June 1998, Hintz conducted surveillance on this home on three occasions and saw plaintiff leave the home between 6:15 a.m. and 6:30 a.m. twice. In July 1998, Hintz conducted surveillance on four occasions. On three of those dates, plaintiff was seen leaving the Villa Park residence around 6:30 a.m.

In August 1998, Hintz had the Villa Park residence under surveillance four times and saw plaintiff leave the premises around 6:30 a.m. three times. During both of his surveillance times in September 1998, Hintz saw plaintiff leave the Villa Park home around 6:30 a.m.

In October 1998, Hintz conducted surveillance on eight occasions. During each surveillance that month, Hintz saw plaintiff leave the Villa Park residence between 6:20 a.m. and 6:40 a.m. In November, Hintz conducted surveillance three times and saw plaintiff leaving the Villa Park house on each occasion around 6:30 a.m. Throughout his investigation, each time Hintz saw plaintiff, he was driving a 1995

GMC Jimmy having license plate "SPU 225," which is registered to plaintiff's father.

During Hintz's cross-examination, plaintiff's counsel brought out that most of the reports completed by Hintz regarding his surveillance were identical, except for the dates. Hintz stated this was "purposeful." Hintz admitted that from where he maintained surveillance, he could not actually see plaintiff leave the residence at 248 North Harvard, but he included that information in his reports because it was the "only logical place for [plaintiff] to come from."

Hintz also testified that he and Beth Fikar, another investigator, interviewed Thomas Kehoe, who lived at 236 North Harvard, regarding who lived at 248 North Harvard. Hintz denied speaking with anyone else in the Kehoe family regarding plaintiff.

Plaintiff testified at the hearing as an adverse witness. Plaintiff stated that he was married in August 1990 and had never divorced or legally separated from his wife. Plaintiff and his wife have two children, a daughter, Danielle, born December 1, 1990, and a son, Michael, born May 31, 1997. Plaintiff testified that Danielle attended school in Lombard, Illinois, which is near Villa Park. He testified that the 248 North Harvard property was purchased in the fall of 1995. At that time, plaintiff's wife and daughter moved into the home.

Plaintiff testified that he had lived at 4623 North Chester "[s]ince probably fall of 1990." He did not know how many units per level were in the building. At the hearing, plaintiff knew the streets surrounding the condominium but did not know all of them when interviewed earlier by representatives of the IGO. At the hearing, plaintiff knew the number of the parking spot for his Chester Avenue residence but did not know it previously when interviewed. Regarding an interview he had with the IGO, plaintiff was asked at the hearing, "During the interview, you knew the importance of telling the truth; isn't that right?" Plaintiff responded, "No."

Plaintiff stated that while working for the City, it was his practice to give his paychecks to his wife. Plaintiff testified that he paid the taxes on the Chester Avenue residence, but his father paid the mortgage. He also testified that neither his wife nor his children had ever been to his Chester Street condominium and stated that a woman named Ricki Donoho lived there, but "[n]ot all the time." Donoho kept clothes there and would "come and go" from the property as she pleased. Plaintiff explained that she was a friend to him and his father and that she slept in the condominium's only bedroom when she stayed there.

Plaintiff stated that the electric bill for the Chester Avenue property was in both his and Donoho's name. Regarding the telephone

number assigned to the Chester Avenue condominium, plaintiff stated that on October 30 and November 25, 1998, he did not have an answering machine at the number, but Donoho did. A document filed with plaintiff's condominium association showed that a burgundy Ford Escort was listed as being assigned to his parking space. Plaintiff stated that he did not own such a car and had never driven one. On cross-examination, plaintiff stated that Donoho owned a burgundy Ford Escort.

As for the house in Villa Park, plaintiff, who is a drummer in several bands, stated he had a music studio built in the basement soon after it was purchased. The studio was originally built as an eight-track recording studio, but plaintiff subsequently "[p]umped it up to a 16." Plaintiff had a key to the Villa Park residence at the time of the hearing and also in 1998. He kept some clothes at the house in Villa Park and further stated that during most of October and all of November of 1998 he stayed there. He did not recall how often he stayed there prior to September 1998. The tax bill for the Harvard residence was in the name of plaintiff, his wife and his father. Plaintiff admitted to receiving "junk" mail at the Harvard residence.

On cross-examination by his counsel, plaintiff stated that his wife was five months pregnant when they married in August 1990, which was the reason for the marriage. A short time later, the two stopped living together. Plaintiff explained that because of religious beliefs, he and his wife did not divorce. Plaintiff testified that bills relating to the condominium were paid from funds in a joint account plaintiff had with his father. Plaintiff also testified that he received mail, including correspondence from the City, at his Chester Avenue address.

Kathleen Kehoe, who lived at 236 North Harvard in Villa Park, testified that she was interviewed by two employees of the IGO and told them she did not know who plaintiff was. Brian Kehoe, Kathleen's son, testified that investigators showed him a picture of plaintiff but he was unable to identify him. After seeing the picture, Brian stated that he saw plaintiff on a "sporadic" basis on the weekends at 248 North Harvard.

Beth Fikar, an investigator with the IGO, testified that she conducted surveillance of the Harvard Street property on five dates in October 1998. She usually began her surveillance about 2:15 p.m. and ended it around 11 p.m. On each of these occasions, Fikar saw plaintiff outside the residence. On four of the five dates, she saw plaintiff arrive at the house driving the GMC Jimmy.

Evidence was also presented at plaintiff's hearing that IGO investigators Brandon Bielke, William Engel, Kenneth Fry and Anthony Zito conducted surveillance of the Chester Avenue address in

October and November of 1998. Most times, the property was under surveillance from about 2:30 p.m. to 7 a.m. the following morning. Oftentimes two investigators were stationed so that all entrances to the Chester Avenue property could be viewed simultaneously. During the eight times in October and five times in November plaintiff's residence in the City was under surveillance, plaintiff was not seen.

Testimony of IGO investigators Christopher Zawarus and Richard Lehr was also presented establishing that plaintiff was seen numerous times in October and November at the Villa Park residence. This is the same time period plaintiff admitted to staying there.

John Gasiorowski testified that he was a supervisor with the IGO and that he interviewed plaintiff on October 29, 1998, with a court reporter present. During this interview, plaintiff was allowed to confer with his union representative, who was his father. During the interview, plaintiff stated that at the time he was not registered to vote, but he had applied using his Chester Avenue address and was waiting to hear back. When asked how long he had lived at that address, plaintiff stated five years. The interview ended when plaintiff stated that he wanted an attorney present.

Gasiorowski testified that plaintiff was also interviewed on November 23, 1998. During this interview, plaintiff had a lawyer with him. When questioned about Ricki Donoho, plaintiff stated that she was a friend of his father's and did housekeeping. Plaintiff also told Gasiorowski that when Donoho stayed all night at his condominium, she slept with him. He characterized their relationship as being "extremely close friends." When asked how many bedrooms were in the house in Villa Park in which he was part owner, plaintiff stated that he "barely spent time there. I think three."

In the hearing officer's lengthy report to the Personnel Board, he commented that investigators had been "successfully cross-examined" regarding reports they had generated and issues had been raised as to the manner in which they conducted surveillance, but he found that the City had met its burden of proof by a preponderance of the evidence with respect to each alleged violation. The hearing officer also found Hintz's testimony with respect to his speaking with the Kehoe family "to be at best misleading," but this was insufficient to render all of Hintz's testimony incredible.

As for plaintiff's testimony, the hearing officer noted that plaintiff testified that he did not know the importance of telling the truth when being interviewed by the IGO. Based upon this statement, the hearing officer questioned whether plaintiff knew the importance of telling the truth during his hearing. The hearing officer addressed many inconsistencies in plaintiff's testimony including the nature of

his relationship with Ricki Donoho and that he had lived at the Chester Avenue condominium since 1990, whereas his residency affidavits showed otherwise. The hearing officer found plaintiff's presentation of documents such as his union card, driver's license and voter registration "self-serving." The hearing officer found plaintiff's testimony "to not be credible" with respect to the court-reported statements made to the IGO. He also found other aspects of plaintiff's testimony "not credible" including that, despite being a one-third owner of the home in Villa Park, plaintiff did not live there, yet he built a recording studio there, which was later "pumped to a 16 track," even though he was the only member of his family who played in a band.

The trial court denied plaintiff's petition for writ of *certiorari*. Plaintiff now appeals to this court.

## ANALYSIS

### I. Constitutionality of the Residency Requirement

Pursuant to the Chicago Municipal Code:

> "All officers and employees in the classified career service of the city, including all employees of the Chicago Board of Education, shall be actual residents of the city. Any officer or employee in the classified career service of the city, including all employees of the Chicago Board of Education, who shall fail to comply with the provisions of this section shall be discharged from the service of the city ***." Chicago Municipal Code § 2—152—340 (1990).

Plaintiff first contends that this residency requirement is unconstitutional as applied to employees who work at O'Hare. He recognizes that residency requirements have been upheld in the past. See, *e.g.*, *Fagiano v. Police Board*, 98 Ill. 2d 277 (1983). However, he attempts to cast doubt upon the supreme court's holding in *Fagiano* by noting recent changes that have taken place with respect to the operations of O'Hare, including that the airport is now part of what plaintiff calls the "O'Hare-Gary Indiana Regional Airport Authority." He claims that employees at O'Hare are no longer employed solely by the City, because O'Hare employees have been called upon to work at Gary Airport. He also notes that O'Hare is no longer funded by the City but, rather, by the airlines, which collect revenue from persons who reside outside the City, and by the federal government. In reliance upon these facts, plaintiff argues that a substantial nexus between the City and O'Hare no longer exists and, therefore, the City's residency requirement is arbitrary and capricious and violates his due process rights.

Municipal ordinances are presumed constitutional. *Van Harken v. City of Chicago*, 305 Ill. App. 3d 972, 976 (1999), citing *City of*

*Chicago Heights v. Public Service Co. of Northern Illinois*, 408 Ill. 604, 609 (1951). Because the City's residency requirement does not involve a suspect classification or a fundamental right, to be constitutional under the due process or equal protection clause of the United States or Illinois Constitution, it must bear a rational relationship to a legitimate governmental interest. See *Bernier v. Burris*, 113 Ill. 2d 219, 227-29 (1986). "One who challenges an ordinance as failing this test of minimum rationality bears the burden of proving 'by clear and affirmative evidence that the ordinance constitutes arbitrary, capricious and unreasonable municipal action; that there is no permissible interpretation which justifies its adoption, or that it will not promote the safety and general welfare of the public.' " *Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 226 (1989), quoting *City of Decatur v. Chasteen*, 19 Ill. 2d 204, 210 (1960).

■ Both at the administrative level and here, plaintiff has made numerous references to the structure of the "O'Hare-Gary Indiana Regional Airport Authority." However, plaintiff has failed to provide this court with any authority, such as copies of, or citations to, any enactment which created the "O'Hare-Gary Indiana Regional Airport Authority." Likewise, he asks this court to declare a presumably constitutional ordinance unconstitutional based upon his bare assertions as to the manner in which O'Hare is funded and the fact that the City now spends substantial sums of money on the Gary Airport, yet excludes Gary residents from working at O'Hare. Based upon the record before us, we do not find that plaintiff's unsupported assertions constitute clear and affirmative evidence sufficient to warrant a declaration that the City's residency ordinance is unconstitutional.

Even if we were to take all of plaintiff's bare assertions as true, we would not find the City's residency requirement, as applied to O'Hare employees, unconstitutional. If there is a conceivable basis for finding the legislation is rationally related to a legitimate governmental interest, the law must be upheld. *Potts v. Illinois Department of Registration & Education*, 128 Ill. 2d 322, 332 (1989). Plaintiff cites no authority for imposing a constitutional requirement that the City differentiate for residency purposes those of its employees who work in areas which receive federal funding or are supported by fees from businesses such as airlines. Despite the recent changes regarding the operations at O'Hare, it is indeed part of the City because the land the airport sits on was annexed by the City in 1956. Chicago City Council, Journal of Council Proceedings 2358-59 (March 28, 1956).

Courts have held "residency requirements may be imposed as a condition of employment." *Budka v. Board of Public Safety Commissioners*, 120 Ill. App. 3d 348, 352 (1983), citing *McCarthy v. Philadel-*

*phia Civil Service Comm'n*, 424 U.S. 645, 47 L. Ed. 2d 366, 96 S. Ct. 1154 (1976). In the context of residency requirements for City Colleges teachers, the fact that taxes and expenditures by employees residing in Chicago will contribute to the support of City Colleges has been held to be rationally related to a legitimate governmental interest. See *Cook County College Teachers Union, Local 1600 v. Taylor*, 432 F. Supp. 270, 273 (N.D. Ill. 1977). Likewise, taxes and expenditures by employees residing in the City, who work at O'Hare and are employed by the City, will contribute to the financial support of the City.

The City also argues, and we agree, that the residency requirement reduces the burden unemployed residents impose upon the City. Because these justifications for the residency requirement justify the legislation, we uphold the ordinance against plaintiff's constitutional challenge. See *McLean v. Department of Revenue*, 184 Ill. 2d 341, 355 (1998).

Plaintiff also argues that the residency requirement is unconstitutionally vague and ambiguous as it pertains to employees at O'Hare. This argument was expressly rejected in *Fagiano*, when our supreme court reviewed language substantially similar to that at issue here. *Fagiano*, 98 Ill. 2d at 281.

We note that plaintiff makes a constitutional challenge to the residency requirement, claiming it violates the privileges and immunities clause of the United States Constitution. In contravention of Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7)), plaintiff has failed to cite any authority in support of this contention, so it is therefore waived. See *Eckiss v. McVaigh*, 261 Ill. App. 3d 778, 786 (1994) ("[c]ontentions supported by some argument but absolutely no authority do not meet the requirements of Supreme Court Rule 341(e)(7)"). Also, plaintiff mentions that his procedural due process rights were violated. "[T]he essence of procedural due process is meaningful notice and meaningful opportunity to be heard ***." *Stillo v. State Retirement Systems*, 305 Ill. App. 3d 1003, 1009 (1999). Plaintiff has articulated no argument in his brief on appeal relating to a lack of notice or a meaningful opportunity to be heard, so this argument is also waived. See *Archer Daniels Midland Co. v. City of Chicago*, 294 Ill. App. 3d 186, 190 (1997).

## II. Sufficiency of the Evidence

Plaintiff contends next that the decision of the Personnel Board recommending discharge based upon his violation of the City's residency requirement was against the manifest weight of the evidence. He argues that the investigators who testified lacked cred-

ibility and that their investigatory procedures were flawed. He argues further that he presented unrefuted evidence that he resided in the City.

■ On review, the findings of fact of an administrative agency are *prima facie* true and correct and will not be disturbed unless contrary to the manifest weight of the evidence. 735 ILCS 5/3—110 (West 1998); *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 427 (1992). The decision of an administrative agency is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). This deferential standard requires affirmance if there is *"any* competent evidence in the record to support the agency's determination." (Emphasis in original.) *Alden Nursing Center—Morrow, Inc. v. Lumpkin*, 259 Ill. App. 3d 1027, 1032 (1994). The administrative agency has the responsibility of weighing evidence, determining credibility and resolving any conflicts in the evidence. *Nichols v. Department of Employment Security*, 218 Ill. App. 3d 803, 809 (1991).

■ A person's "residence" is " 'the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning.' " *Fagiano*, 98 Ill. 2d at 283, quoting *Peirce v. Peirce*, 379 Ill. 185, 192 (1942). "Because intent may be manifested in ways too numerous to simply be listed, an administrative board must look to all of the factors present." *Fagiano*, 98 Ill. 2d at 287.

Plaintiff relies upon *Raczkowski v. City of Chicago*, 142 Ill. App. 3d 378 (1986), where the petitioner, a microbiologist with the City's department of health, had been discharged based upon the Personnel Board's determination that he did not live in the City. The petitioner had an ownership interest in both an apartment in the City and a house in the suburbs, in which his wife and children lived. He had numerous connections to the City, including voter registration, automobile registration, membership in civic organizations and bank accounts. The petitioner was observed on every occasion during eight surveillances conducted at the suburban residence and was never seen at his City residence during four surveillances, which lasted no longer than 2½ hours. This court found the decision of the Personnel Board was against the manifest weight of the evidence. *Raczkowski*, 142 Ill. App. 3d at 382. This court noted that although investigators had seen the petitioner numerous times at the suburban residence, the petitioner presented reasonable explanations as to why he was at that address. The court also relied upon the fact that the testimony of the neighbors to the suburban residence established they had seen the

petitioner infrequently and that no evidence was presented by the City showing that comparable interviews had been conducted with neighbors of the City residence, which resulted in information unfavorable to the petitioner. *Raczkowski*, 142 Ill. App. 3d at 381.

Similarly, argues plaintiff, in his case, he also had several connections to the City including his voter registration, union card and driver's license. See *Walsh v. County Officers Electoral Board*, 267 Ill. App. 3d 972, 979 (1994). Plaintiff argues further that the lack of testimony from any neighbors to the Villa Park address establishing that he lived at the suburban residence undermines the City's case against him.

Plaintiff also relies upon *Stafford v. City of Chicago*, No. 1—97—4393 (1999) (unpublished order under Supreme Court Rule 23), in support of his claim that the evidence presented at his hearing established that he was a resident of the City. As for the *Stafford* case, Supreme Court Rule 23(e) states that "[a]n unpublished order of the court is not precedential." 166 Ill. 2d R. 23(e). Therefore, we will not review the case here. See *In re Marriage of Chapman*, 162 Ill. App. 3d 308, 315 (1987).

In reply, the City maintains that the evidence presented in support of plaintiff's claim that he lived in the City lacked credibility. The City cites *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648 (1983), and argues we should affirm the decision of the Personnel Board because the facts in that case resemble the facts in plaintiff's case. In *O'Boyle*, the Personnel Board suspended the plaintiff, a firefighter with the City, for 60 days based upon a recommendation of the hearing officer, who had determined the plaintiff had violated the City's residency requirement. The trial court reversed the suspension and the Personnel Board appealed. The facts showed that the plaintiff owned a home in Palos Hills in which he, his wife and two children had lived. After the plaintiff's wife refused to move to the City, the couple legally separated and the plaintiff moved in with his parents in their City home while his wife and children remained in the suburbs. A year later, the plaintiff and his wife had a third child. The couple eventually reconciled and moved to the City, but not before residency charges had been brought. The plaintiff was observed five times over a two-month period at the suburban residence by investigators. Two neighbors, who had been interviewed, stated the plaintiff lived in the suburbs. Based upon these facts, this court reinstated the decision of the Personnel Board, stating that a person may have only one domicile at a time and that the evidence established that the plaintiff had not abandoned his Palos Hills domicile and, therefore, had not acquired a new one in the City. *O'Boyle*, 119 Ill. App. 3d at 656.

■ Based on the record before us, we agree with the City's argument and find that plaintiff's argument is not supported by the facts. Unlike the surveillances in *Raczkowski*, which were limited both in frequency and duration, the record establishes that plaintiff was under surveillance for an extended period of time. Not once was he observed at his alleged residence in the City, while he was observed at the house in Villa Park on 26 out of the 29 times it was monitored. The evidence also established that the parking spot assigned to his condominium was registered to a vehicle other than the one he consistently drove. While the hearing officer in the instant case did state in his findings that the investigators had been "successfully cross-examined" as to their reports and as to the manner in which they conducted some of the surveillances, nonetheless, he found their testimony credible overall. The hearing officer was acting within his purview when resolving the conflicts in the evidence and the weight to be given their testimony. See *Nichols*, 218 Ill. App. 3d at 809.

It is true that plaintiff did present documentation, such as a voter registration card, containing his Chester Avenue address, but the hearing officer found the items "self-serving." The record supports this conclusion given that plaintiff was not registered to vote when interviewed during the IGO's investigation. A conclusion that plaintiff lived in Villa Park, rather than the City, is further supported by evidence showing that plaintiff had a recording studio installed in that home.

As the City asserts, the hearing officer also found other aspects of plaintiff's evidence incredible. We do not find this conclusion in error because the record is replete with inconsistences in the differing versions of the facts plaintiff told investigators and testified to at his hearing. For instance, at various times Ms. Donoho is a "housekeeper," a friend of his father's and his "extremely close" friend. Also, when interviewed by the IGO in late November 1998, plaintiff stated that he "barely spent time" at his house in Villa Park, yet at the hearing he admitted that he consistently stayed there during October and November of that year. Finally, plaintiff himself admitted that he lacked the ability to appreciate the importance of telling the truth while being interviewed by the IGO. The decision of the hearing officer was not against the manifest weight of the evidence.

### III. Suppression of Evidence

■ Plaintiff contends further that the hearing officer erred in not suppressing evidence gathered by the City more than six months after it began its investigation based upon the IGO's failure to notify the mayor of its continued investigation.

The Chicago Municipal Code provides that, "If any investigation is not concluded within six months after its initiation, the inspector general shall notify the mayor of the general nature of the complaint or information giving rise to the investigation and the reasons for failure to complete the investigation within six months." Chicago Municipal Code § 2—56—080 (1990).

Plaintiff argues that all of the City's evidence not received by May 7, 1998, which was six months from November 7, 1997, the date the City began its investigation into plaintiff's residency, should have been suppressed as being the "fruit of the poisonous tree." *Nix v. Williams*, 467 U.S. 431, 442, 81 L. Ed. 2d 377, 386, 104 S. Ct. 2501, 2508 (1984). He also cites a portion of the Illinois Code of Criminal Procedure of 1963, which allows a hearing officer to suppress evidence improperly obtained by means of an eavesdropping device. See 725 ILCS 5/108A—9 (West 2000). Likewise, plaintiff argues an appropriate remedy for violation of the ordinance requiring the IGO to inform the mayor of its continued investigation of him is the suppression of the evidence obtained after six months.

" '[T]he exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.' " *McCullough v. Knight*, 293 Ill. App. 3d 591, 596 (1997), quoting *United States v. Calandra*, 414 U.S. 338, 348, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 620 (1974). With respect to the exclusionary rule and its use beyond criminal proceedings, such as this, it is proper to balance the likely social benefits of excluding unlawfully seized evidence against the likely costs. *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 200 (1993). Where the costs exceed the benefits, the exclusionary rule need not be applied. *Grames*, 254 Ill. App. 3d at 200.

While it is true the mayor was not contacted regarding the IGO's continued investigation of plaintiff, the evidence gathered by the IGO subsequent to May 7, 1998, was relevant and probative as to plaintiff's violations of the City ordinances and the proceeding in which it was admitted was not criminal in nature. The length of the investigation resulted in a more thorough investigation, which arguably protected plaintiff from being discharged without cause. These facts support a finding for admission of the evidence. See *Grames*, 254 Ill. App. 3d at 201.

Furthermore, unlike the provision of the Code of Criminal Procedure relating to suppression of evidence obtained from an eavesdropping device, the ordinance section which requires that the mayor be notified if a particular investigation extends beyond six months does not provide a remedy for the targeted party. Plaintiff cites no cases for his argument that compliance with the notification

requirement is a prerequisite to admission of evidence obtained beyond the six-month period. A plain reading of the section of the ordinance at issue does not support plaintiff's argument that it confers personal rights upon the subjects of investigations or that it was intended to protect their interests. The mayoral notification requirement may be seen to be merely a way to spur the IGO to conduct its investigations expeditiously. Therefore, we are unpersuaded that the exclusionary rule should have been applied by the hearing officer.

■ Plaintiff further contends that the hearing officer erred in denying his motion to suppress statements obtained in violation of the City of Chicago's Personnel Board rules.

The record indicates that during his October 29, 1998, interview with the IGO, either plaintiff or his union representative requested that plaintiff be ordered to answer questions during the interview. Scott Loeff, an employee relations supervisor with the City and a superior to plaintiff, then ordered plaintiff to answer questions posed by the IGO. Loeff informed plaintiff that failure to answer the questions would be deemed a violation of Personnel Rule XVIII, section 1, paragraph 25, which provides that a City employee can be discharged for "Insubordinate actions, including failure to carry out a rule, order or directive related to the performance of the employee's duty ***."

When the union representative for plaintiff, who was plaintiff's father, inquired as to what the consequence was if plaintiff chose not to answer the questions, Loeff responded, "The consequence will probably be discharge."

Personnel Rule XVIII, section 1, provides:

"As with all Personnel Rules, it should be noted that if an employee is covered by a Collective Bargaining Agreement; that agreement shall govern in the event of a conflict between any part of this Rule and any such agreement. Employees covered by such agreement can only be discharged for just cause."

Section 11.4, paragraph F, of the collective bargaining agreement applicable to plaintiff states:

"An employee under investigation shall not be threatened with transfer, dismissal or disciplinary action, or promised a reward, as an inducement to provide information relating to the matter under investigation, or for exercising any rights contained in this Agreement, provided, however, that this Section shall not prohibit or prevent an accurate reading of the employee's administrative rights, or the imposition of discipline in accordance therewith."

Based upon these provisions, plaintiff argues that because he was threatened with discharge in violation of the collective bargaining agreement, his subsequent statements should have been suppressed.

In the absence of a collective bargaining agreement, it is well settled that a public employee may be terminated for insubordination due to a refusal to testify to matters concerning that which the employer is entitled to inquire. Our supreme court stated in *Kammerer v. Board of Fire & Police Commissioners*, 44 Ill. 2d 500, 506 (1970):

> "[I]f a public employee refuses to testify as to a matter concerning which his employer is entitled to inquire, he may be discharged for insubordination, but if he does testify his answers may not be used against him in a subsequent criminal prosecution. No case has been cited, and we have found none, which holds that a public employer, in the course of a disciplinary hearing into an employee's conduct, may not require the employee to disclose information reasonably related to his fitness for continued employment."

Since residency is a prerequisite to continued employment with the City, clearly the City would be entitled to inquire as to an employee's place of residency. Therefore, any claim for suppression would need to be based on a violation of the collective bargaining agreement. Plaintiff argues that section 11.4, paragraph F, of the collective bargaining agreement applicable to plaintiff may reasonably be interpreted to mean that a covered employee may not be threatened with discharge for failure to answer questions. The record shows that during the October 29, 1998, interview with the IGO, plaintiff or his union representative requested that plaintiff be ordered to answer any questions. In response to this request, Mr. Loeff ordered plaintiff to answer the questions. When asked what the consequences would be for failing to answer, Mr. Loeff replied, "The consequence will probably be discharge." The hearing officer made a finding that this exchange did not constitute a threat. Rather, it was an accurate reading of plaintiff's administrative rights. The October 29, 1998, interview terminated shortly after this exchange, when plaintiff requested the presence of an attorney.

Plaintiff was again interviewed, in the presence of his counsel and union representative, on November 23, 1998. The hearing officer made a finding that during that interview, plaintiff was read his administrative rights and was not threatened. Section 11.4, paragraph F, of plaintiff's collective bargaining agreement specifically permitted the City to read the employee his administrative rights and to impose discipline in accordance with those rights. The hearing officer's determination involved an examination of the legal effect of a given set of facts, *i.e.*, whether reading plaintiff his administrative rights amounted to a threat. As the hearing officer's determination of this issue involved a mixed question of fact and law, we apply a clearly er-

roneous standard of review to our examination. See *City of Belvidere,* 181 Ill. 2d at 205. The hearing officer's determination that plaintiff was not threatened but was merely read his administrative rights was not clearly erroneous. As the collective bargaining agreement permitted this action, it cannot provide a basis to suppress plaintiff's statements.

Finally, we note that none of plaintiff's statements to the IGO were directly inculpatory. The statements were used as impeachment of plaintiff's testimony at the hearing and to show that his denials were not worthy of belief. Statements taken in violation of a criminal defendant's fifth amendment rights are admissible for similar purposes. See *People v. Williams,* 181 Ill. 2d 297, 327 (1998); *People v. Easley,* 148 Ill. 2d 281, 319-20 (1992). Denial of plaintiff's motion to suppress statements was particularly appropriate in the instant case where it was plaintiff or his union representative who requested that plaintiff be ordered to answer questions in the interview.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL, P.J., and GREIMAN, J., concur.