LEONARD RACZKOWSKI, Petitioner-Appellant, v. THE CITY OF CHICAGO et al., Respondents-Appellees.

First District (3rd Division) No. 84—2660

Opinion filed March 31, 1986.

White, J., dissenting.

Grahn & Grahn, Ltd., of Chicago (Catherine L. Grahn, of counsel), for appellant.

James D. Montgomery, Corporation Counsel, of Chicago (Mary K. Rochford and Joseph A. Moore, Assistant Corporation Counsel, of counsel), for appellees.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Petitioner, Leonard Raczkowski, filed a petition for writ of *certiorari* for a review of the decision of respondent personnel board of the city of Chicago discharging him from his position with the department of health for failure to comply with the residency requirements of the Municipal Code of respondent city of Chicago. The writ was granted, and following a hearing, the circuit court affirmed the decision of the personnel board. On appeal, petitioner contends that the decision of the personnel board was contrary to the manifest weight of the evidence. We reverse.

At petitioner's hearing before the hearing officer, petitioner was called by the city to testify as an adverse witness. Petitioner testified that he was 55 years old and that he lived at 2312 West Rice Street,

Chicago. His career service title was that of Microbiologist III, and he was the acting administrator of the West Side Center for Disease Control. He had been employed by the city since 1951.

Petitioner further testified that he was married and had four children. During the period of the residence investigation, his wife and two youngest children resided at One Regents Lane, Lincolnshire. Petitioner and his wife own the Lincolnshire home in joint tenancy, and in 1980 they filed a joint tax return. According to petitioner, his wife's name was on his checking and savings accounts. His wife paid the real estate taxes and utility bills for the Lincolnshire home. Petitioner gave his wife money for expenses associated with that property.

In regard to his own residence, petitioner stated that he and his wife purchased the six-flat building at 2312 West Rice Street around 1962. During the relevant period of 1980 when the city was conducting its investigation, five of the apartments were rented to tenants, and petitioner occupied the sixth apartment. The apartment has four rooms, including a bedroom and a kitchen. Petitioner had numerous connections with the city such as voter registration, automobile registration, membership in civic organizations and bank accounts. He usually spent weekends at the Lincolnshire residence to be with his children, and he spent a week there in August 1980, when his wife had surgery.

The city also called Lydia Conlisk, an investigator for the Chicago police department, to testify. She testified regarding various surveillances she made of the One Regents Lane home and the Rice Street residence. Although she saw petitioner at the Lincolnshire residence when she made her first surveillance, she subsequently determined that petitioner was on vacation at this time. Conlisk further testified regarding seven additional surveillances made of the Regents Lane property between January 4, 1980, and August 6, 1980. In each instance, petitioner was seen leaving from the Regents Lane address around 7:15 a.m. and heading in the direction of the clinic where he was employed. On one occasion, petitioner had with him a young girl that he took to high school. On another occasion, he had a woman in the car.

Conlisk stated that she performed four similar surveillances of the Rice Street property during this same period. The first surveillance lasted from 6 a.m. to 8 a.m., and the remaining surveillances lasted from 6 a.m. to 8:30 a.m. She did not see petitioner on any of these dates. Conlisk stated that petitioner's name was on the mailbox at the Rice Street address.

Three Regents Lane neighbors also testified for the city. One man testified that he lived across from One Regents Lane, and that during 1980, he saw petitioner mowing the lawn, walking the dog, working in the yard and driving his car. On cross-examination, the neighbor testified that he might have seen petitioner doing these tasks on a weekend. The neighbor's wife testified that she occasionally saw petitioner walking the dog and working on the lawn during 1980. A third neighbor testified that she could not swear to seeing petitioner during 1980.

Petitioner testified on his own behalf that prior to 1976, he was living at One Regents Lane and that he truthfully reported that address even though it showed that he was not in compliance with the city's residency requirements. He moved to his mother-in-law's apartment in the city when his residency was questioned in 1976. In 1978 or 1979, he moved to one of the apartments in the building on Rice Street which he and his wife had purchased in the early sixties. Petitioner explained that he tried to get his wife to move back to the city, but she refused. Eventually, they separated. Petitioner stated that both he and his wife are Catholics, and they do not believe in divorce.

Petitioner gave reasons for being seen by Conlisk at various times at the Lincolnshire address. One surveillance was on a Monday, and petitioner had been out at the house on Sunday and stayed over and taken Monday as a vacation day. On another occasion, his youngest child had been ill, and he went to see her. He stayed the night and then took her to school in the morning. Petitioner also testified that in August 1980, his wife had surgery on her feet, so he had to take her to the doctor. Regarding the maintenance petitioner did on the Regents Lane home, petitioner stated that he had tried hiring other people to perform the work, but that such an arrangement proved too expensive.

Clearly, the evidence presented here was not sufficient to support the finding of the personnel board that petitioner did not reside in the city of Chicago. Although the board recognized in its finding that "both intent to reside within the corporate boundaries of the city of Chicago, and a reasonable degree of bodily presence within said corporate boundaries are required for employment by the city of Chicago," the board failed to properly apply these standards in the present case.

In *Fagiano v. Police Board* (1983), 98 Ill. 2d 277, 287, 456 N.E.2d 27, 31, the supreme court stated that the principle issue to be decided in residency cases is that of intent. The court recognized

that intent may be manifested in many ways, and it refused to itemize factors in "laundry-list fashion" since it was concerned that the board would approach the question of intent in a mechanical way, rather than making individualized determinations. Here, the only evidence which supports the personnel board's finding is the testimony of the investigator that on a few occasions she saw petitioner leaving the Lincolnshire property around 7:15 a.m., and she did not see petitioner leave his Rice Street residence on the days when that property was under surveillance. Petitioner, however, explained the special circumstances which required his presence at the Lincolnshire property, including various family crises. While the board suggests that petitioner's explanations were contrived, there was no evidence presented at the hearing which contradicted petitioner's testimony.

As for the investigator's failure to see petitioner leave from the Rice Street apartment on the days when that property was under surveillance, even the hearing officer commented on the negligible value of such evidence. Moreover, the investigator observed the Rice Street apartment only half as many times as the Lincolnshire home. Also, after the first surveillance, the investigator extended the time for the surveillance, which strongly suggests that the investigator recognized that petitioner could have left for work from the apartment after she had concluded her first surveillance. There is no testimony in the record which establishes how long it would have taken petitioner to go from his apartment to his place of work.

The other evidence presented by the city was equally unpersuasive. The testimony of the Regents Lane neighbors that they saw petitioner infrequently, if at all, supports petitioner's position that he did not reside at the Regents Lane home. Also, there is no evidence in the record that the inspector conducted comparable interviews of any Rice Street neighbors which yielded information unfavorable to respondent.

In addition, we reject the board's argument that petitioner's continued interaction with his family and other evidence of his involvement with the Lincolnshire home evidenced petitioner's intent to make the suburban home his residence. Petitioner testified that his original separation from his wife, which occurred when he moved into the city to comply with residency requirements, became a permanent separation. Divorce was not possible for religious reasons. The fact that the separation was apparently amicable and that petitioner voluntarily continued to support his family does not, in itself, establish that petitioner intended to reside in Lincolnshire. The city did not present any evidence that petitioner's wife was employed or

had any type of income.

In this regard, we disagree with statements made by the circuit court to the effect that the only way someone in petitioner's situation can establish that he is a resident of the city is to obtain a divorce. Such a requirement is clearly contrary to *Fagiano's* mandate that all circumstances in each case must be carefully considered. Also, we believe that it would be contrary to public policy to require that a city employee divorce his spouse and abdicate all responsibility for his family, unless otherwise ordered by a court, solely to be able to establish that he had a separate residence in the city. Moreover, in *Miller v. Police Board* (1976), 38 Ill. App. 3d 894, 349 N.E.2d 544, the court recognized that separate residences would not be unusual where the city employee and his spouse were *separated* or divorced. 38 Ill. App. 3d 894, 898, 349 N.E.2d 544, 548.

Finally, this case is different from other situations where the city address of an employee was found to be a sham either because the alleged residence was uninhabitable or because several city employees all claimed to reside at the same address. Here, it is undisputed that petitioner owns the Rice Street building where he testified that he resides. The apartment has four rooms, including a bedroom and a kitchen. There was no evidence that anyone else inhabited the apartment. Therefore, with the exception of the inspector's failure to see petitioner during the four surveillances she made of the Rice Street apartment over an eight-month period, the record is devoid of any evidence relating to the Rice Street apartment which supports the board's finding that petitioner did not reside in the apartment.

For all these reasons, we conclude that the decision of the personnel board that petitioner did not intend to reside and did not in fact physically reside within the corporate boundaries of the city of Chicago is against the manifest weight of the evidence, and the circuit court erred in affirming the board's decision.

Accordingly, the order of the circuit court and the decision of the personnel board are reversed.

Order reversed.

McGILLICUDDY, J., concurs.

JUSTICE WHITE, dissenting:

I would not reverse the order of the personnel board of the city of Chicago and the order of the circuit court. After investigation and an evidentiary hearing, the board found that Leonard Raczkowski, an

employee of the department of health of the city of Chicago, was not an actual resident of Chicago, but indeed he lived at One Regent Lane, Lincolnshire, with his wife and children and that he was thereby guilty of violating chapter 25, section 30, Municipal Code of Chicago and violating Personnel Rule XVI, section 1(j) and section 1(k) of the city of Chicago. The board ordered that Raczkowski be discharged; he filed in the circuit court a petition for writ of *certiorari*, seeking judicial review of the board's decision. Judge James C. Murray, on September 20, 1984, entered an order affirming the decision of the personnel board. This appeal followed.

To place this case in the proper perspective, it is well to repeat what this court said in *Caldbeck v. Chicago Park District* (1981), 97 Ill. App. 3d 452, 458-59, 423 N.E.2d 230:

> "In a *certiorari* proceeding, the court must ascertain *** whether there is anything in the record which fairly tends to sustain the action of the agency. (*Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65.) The reviewing court may not weigh the evidence or judge its probative value but rather only must determine whether the decision is supported by the evidence or is manifestly against the weight of the evidence."

The majority opinion on its face amply shows that this is purely a case of conflicting testimony and credibility of witnesses, and this affords no basis for the substitution of our judgment for that of the personnel board. The majority in weighing and evaluating the testimony before the personnel board does precisely what the law forbids a reviewing court to do. "We are not permitted to weigh the evidence or judge its probative value. We are restricted in our determination to examination of the record and to a determination of whether the decision of the Board finds support in the evidence or is manifestly against the weight of the evidence." *Kallas v. Board of Education* (1973), 15 Ill. App. 3d 450, 453, 304 N.E.2d 527.

This is a simple, straightforward question of fact addressed by the board: was Leonard Raczkowski an actual resident of the city of Chicago, as of August 28, 1980, and prior thereto? The city introduced the testimony of three neighbors of Raczkowski who lived on Regent Lane in Lincolnshire. All knew him, and had seen him around and about the house at One Regent Lane, regularly engaging in activities normally done by residents, such as working in the yard once or twice a week or walking the dog that lived there. Further, an investigator for the Chicago police department testified that she saw Raczkowski leave One Regent Lane, Lincolnshire, at 7:15 a.m.,

driving a car registered to him at that address on each of the following days:

January 4, 1980
April 9, 1980
May 19, 1980
May 21, 1980
June 30, 1980
July 23, 1980
August 6, 1980.

The investigator confirmed that on those days Raczkowski was working on his city job at 8 a.m. In addition, the investigator testified regarding a surveillance at 2312 West Rice Street, Chicago, where Raczkowski claims he lived, conducted on the following dates:

February 20, 1980
May 5, 1980
May 13, 1980
August 20, 1980.

These surveillances were from approximately 6 a.m. to approximately 8:30 a.m.; on none of these occasions did she see Raczkowski leave his purported city address although he worked those days.

In urging the reversal of the personnel board and the circuit court, Raczkowski relies largely upon his own uncorroborated testimony. He admitted that he was domiciled with his wife and children in Lincolnshire from 1972 through 1975. The issue in this case therefore is whether he established a new domicile in Chicago after 1975 and prior to August 28, 1980. (*O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 654, 456 N.E.2d 998.) The party seeking to prove a change of domicile has the burden of proving that he intended to change domiciles. (*In re Estate of Elson* (1983), 120 Ill. App. 3d 649, 655, 458 N.E.2d 637.) Raczkowski testified that his wife and children live at One Regent Lane, Lincolnshire, and although he spends substantial amounts of time there, he and his wife are separated. However, he and his wife filed joint Federal tax returns from the Lincolnshire address. His bank accounts have that address. The record indicates that Raczkowski owns an apartment building in Chicago. From that address he is registered to vote, and the address appears on his driver's license and on the registration of one of his cars. He gave explanations for four of the eight times he was sighted in Lincolnshire. Of course, the personnel board was not obligated to accept these explanations as true. No explanation was given of the other four times he was seen there walking the dog or mowing the lawn. Significantly, the investigators never saw him in

four surveillances of his Chicago address conducted at times when people normally leave home to go to work, and Raczkowski, although he had the burden of proof, brought forward no Chicago resident to testify that Raczkowski was his neighbor. There is ample evidence to conclude that he was not domiciled in Chicago but in Lincolnshire, as the personnel board found. Even if we view Raczkowski's self-serving testimony as evidence to the contrary, it provides no basis for reversing the decision of the board.

"If the issue before the reviewing court is merely one of conflicting testimony and credibility of witnesses, the administrative board's decision should be sustained. [Citation.]

In order for a court of review to find that an agency's decision is against the manifest weight of the evidence so as to justify substituting its judgment for the discretion of the board, the court must be able to conclude that 'all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous,' (*Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508), and that the opposite conclusion is clearly evident. [Citation.] That an opposite conclusion might be reasonable or that the court might have reached a different conclusion is not adequate to set aside the agency's decision. [Citation.]" *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 653, 456 N.E.2d 998.

The city investigated this case well and produced evidence that Leonard Raczkowski was not seen at the Chicago address where he claimed he lived and that he was seen regularly at his Lincolnshire home. Raczkowski is a Microbiologist III employed by the department of health. The decision of the majority could have a chilling effect on the commendable efforts of the city of Chicago to stem the brain drain and the flight from the city of the middle class through enforcement of those provisions of its Code and Personnel Rules requiring that city employees be residents of the city.

I dissent.