# Illinois Official Reports

## Appellate Court

---

### *Thomas v. Chicago Transit Authority*, 2014 IL App (1st) 122402

---

| | |
|---|---|
| Appellate Court Caption | DANIEL THOMAS, Plaintiff-Appellant, v. CHICAGO TRANSIT AUTHORITY, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2402 |
| Filed | December 23, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-24345; the Hon. Rita M. Novak, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Dykema Gossett PLLC, of Chicago (Jeffrey E. Jamison, of counsel), for appellant.<br><br>Chicago Transit Authority, of Chicago (Karen G. Seimetz, Stephen Wood, and Rachel Kaplan, of counsel), for appellee. |

JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Neville and Liu concurred in the judgment and opinion.


**OPINION**

¶ 1       Plaintiff, Daniel Thomas, filed a petition for writ of *certiorari* in the circuit court seeking review of a Chicago Transit Board (Board) ordinance sustaining the Chicago Transit Authority's (CTA) termination of Thomas's employment for violation of its requirement that certain employees reside within a specified service area. The trial court denied the petition. On appeal, plaintiff seeks reinstatement, contending that the decision to terminate his employment is clearly erroneous based on the undisputed facts that he abandoned his suburban residence and intended to and did permanently reside within the service area. For the following reasons, we reverse the decisions of the circuit court of Cook County and the Board.


¶ 2                                    BACKGROUND
¶ 3       During the relevant time, Chicago Transit Authority Ordinance No. 005-201 (eff. Dec. 14, 2005) was in effect and required nonunion CTA workers, like Thomas, to live within a specified residency area within six months of starting work. The ordinance provides that an employee's "(j) 'Residence' shall be defined to be the actual domicile of the individual. An individual can have only one domicile" and "(k) An employee's failure to reside within the residency area shall be considered cause which is detrimental to the service and grounds for discharge." *Id*. The stated purpose of the ordinance is to provide a "greater recovery of sales tax revenues, a work force more aware of the importance of public transit in communities served by CTA, a more flexible workforce who live closer to where they work, and a workforce having a greater opportunity to travel on CTA buses and trains." *Id*. Upon good cause shown, an employee could request a one-year extension to establish a qualified residence prior to the expiration of the original six-month period.

¶ 4       Thomas was hired by the CTA in June 2008 as a resource planner. During the employment process, he was presented with the CTA's residency requirement and told that his employment was conditioned on satisfying the requirement. Thomas executed a "residency acknowledgment for Non-Union Candidates" form on June 4, 2008, acknowledging that he did not reside in the residency area and attesting that he would move into the residency area within six months from his first day of employment. Contemporaneously, Thomas executed a separate document entitled "Acceptable Proof of Residency." This form instructed Thomas to provide the CTA with two section "A" documents and one section "B" document showing the employee resided in the service area. The section "A" and "B" documents were defined as:

> "Section A: Illinois Driver License, Illinois Identification Card, Illinois Vehicle registration card, most recent; Illinois Voter registration card, most recent; Mortgage documents for current residence; Lease Agreement/Housing rental contract for current residence (within 30 days and showing full Illinois address)

Section B: Rent receipt (within 30 days and showing full Illinois address); Utility bill ***; Bank statement (within 45 days and showing full Illinois address); An official letter from another state or local government agency on the agency's letterhead or containing the official seal of the issuing agency issued within the previous 30 days; official postmarked mail ***."

¶ 5    When hired, Thomas and his family were residing in Arlington Heights, Illinois, which is outside of the CTA service area. On July 1, 2008, Thomas received a letter at his Arlington Heights residence explaining that as a condition of his employment he must reside in the service area by December 17, 2008, six months from his first day of work and that failure to comply with the requirement was grounds for termination. The letter further explained that Thomas could apply for a one-year extension to the six-month grace period upon good cause shown.

¶ 6    On November 13, 2008, Thomas applied for the one-year extension. In his application, Thomas explained that he had been attempting to sell his home and move into the residency area since June 2008. He made improvements to the house and placed it on the market, but despite these efforts he had been unable to sell the home. Enclosed with this request was the real estate listing agreement and specifications for the Arlington Heights residence. The CTA responded on November 14, 2008, asking Thomas to provide documents showing not only his attempt to sell or lease the home, but also documents demonstrating that he had searched for a home in the service area. Thomas responded on November 26, 2008, explaining that he and his wife surveyed the service area and spent time reviewing the "housing stock" and schools; that they had driven through various neighborhoods; and that they received daily emails from his realtor listing the homes on the market in the service area. Thomas enclosed correspondence from his real estate broker confirming he was searching for housing in the CTA service area. On December 5, 2008, the human resources department recommended an extension until December 2009. The CTA granted the extension.

¶ 7    On December 8, 2009, Thomas submitted a memo and supporting documents to the CTA's human resources department showing a change in his residency. The supporting documents consisted of a copy of a residential lease for 7531 N. Oleander in Chicago, Illinois, a bank statement and an Illinois driver's license, both reflecting the Chicago address. On December 14, 2009, based on the new information, the human resources department declared that Thomas's residence was within the CTA service area.

¶ 8    Sometime later, a request was sent to the CTA's office of the inspector general (OIG) to confirm Thomas's residency. The OIG conducted an investigation and issued a report on February 12, 2010. The OIG report concluded that Thomas was not in compliance with the residency requirement. The OIG report stated that the Chicago residence was owned by a relative of Thomas, and although the Chicago property showed signs it was being occupied and mail for the Thomas family was being received at that address, Thomas actually resided in Arlington Heights. The investigation confirmed the Arlington Heights home had been on the market continuously since June 2008. It stated that Mrs. Thomas and her five-year-old twins continued to reside there. The twins attended day care in Arlington Heights. The investigation showed that Mrs. Thomas is confined to a wheelchair and requires special assistance and accommodations within their home. Due to Mrs. Thomas's disabilities, she had not moved into the Chicago residence because it did not accommodate her disability. The report stated that Thomas explained he lived at the Chicago address Monday through

Thursday and stayed with his family on the weekends. Due to his wife's physical disability, he would drive to the Arlington Heights home early in the morning to get the children ready and drive them to day care. Thomas would then assist his wife in getting ready for work, transport and commute with her to her Chicago job and then he would continue to CTA headquarters. After work, Thomas and his wife would take a Metra train to Arlington Heights and pick up their children from day care. After securing his family for the night, Thomas returned to his Chicago residence. The OIG report stated that, pursuant to the residency ordinance, "an individual can have only one domicile" and the law provided that a person's true and permanent home should be his actual residence. The report concluded that because Thomas's "family continues to reside outside the residency area and he only uses the Chicago residence to sleep on certain nights during the week, he is not in compliance with CTA's residency ordinance."

¶ 9 Attached to the report was a memo delineating the dates the investigators checked the residences and their observations: the Chicago residence was for sale and had tire tracks going in and of out of the garage indicating the home was being occupied; the Thomases received mail at the Chicago residence, however, Thomas did not submit a change of address form to establish his new address in Chicago; the Arlington Heights residence had a "For Sale" sign in the front yard and had a shoveled driveway and sidewalk; and, on one occasion surveillance of Thomas showed him leaving CTA headquarters and going to the Ogilvie Transportation Center, where he boarded a train to the northwest suburbs. Lastly, the report indicated that on two separate visits to the Chicago residence, during the daytime, no one answered the doorbell.

¶ 10 As a result of the OIG report, the CTA determined that although Thomas had submitted acceptable documentation showing he was living in Chicago, Thomas did not reside in the CTA service area. On February 19, 2010, the CTA sent Thomas a notice of termination explaining the OIG investigation found Thomas did not reside within the CTA service area in violation of the ordinance.

¶ 11 Thomas requested review of his termination before the CTA Board pursuant to section 28 of the Metropolitan Transit Authority Act (70 ILCS 3605/28 (West 2008)). In his request Thomas stated that his primary and legal residence was in Chicago and he was in compliance with the ordinance. He further stated: (1) he has attempted to sell his Arlington Heights home since June 2008 and to move into the CTA service area; (2) his wife has a physical disability which requires her to use a wheelchair for mobility; (3) he has been living at the Chicago address (owned by a family member) since December 2009 while looking for a home in the service area and trying to sell his Arlington Heights home; (4) the Chicago house is not wheelchair accessible and, therefore, he resided in a separate residence from his wife and two five-year-old children; and (5) due to his wife's disability, Thomas needs to help her with her daily commute, do chores, care for his wife and children and take the children to school. Thomas further stated that the CTA was requiring him to get divorced in order to establish a separate domicile from his wife. The request for a section 28 hearing was granted.

¶ 12                              A. The Section 28 Hearing

¶ 13 The hearing was held on May 10, 2010. Three witnesses testified: OIG criminal investigator J. Martin Walsh, for the CTA, and Thomas and his wife, Jennifer Thomas.

- 4 -

## 1. CTA Witness

OIG criminal investigator J. Martin Walsh confirmed the veracity of the documents submitted by Thomas to show his residence in Chicago. He testified that the Chicago and Arlington Heights residences were visited for surveillance during the daytime, on a Thursday or Friday and a Saturday. There were visible tire tracks showing a vehicle had entered and exited the garage behind the Chicago residence indicating someone was staying at the Chicago residence. When he was at the suburban residence he observed a "For Sale" sign on the property and no one was present. He interviewed Thomas, his wife, the postal carriers and an employee at the children's suburban preschool. Walsh found that Thomas stayed at the Chicago residence Monday through Thursday and at the suburban residence on the weekends. Walsh testified that throughout Thomas's employment with the CTA, the Thomas family continued their efforts to sell the suburban residence. Walsh opined that under the CTA's definition, "where you can only have one domicile and based on the fact that the Oleander [residence] was temporary, and that his family resided full time in Arlington Heights and he was there on the weekends and assisting the family on the weekdays, that was, in my mind, considered the primary residence."

On cross-examination, Walsh testified that Thomas had been sleeping at the Chicago residence; he had a lease showing he rented the property; he was paying the utility bills for the Chicago residence; and he changed his driver's license and bank statement to reflect the Chicago residence. Walsh concluded that the Thomas family was legitimately trying to sell the suburban home without success. Walsh explained that Thomas slept at the Chicago residence every night Monday thru Thursday, waking at 5 a.m. to go to Arlington Heights to help his wife and children get ready, taking his children to day care and his wife to the train. After work, Thomas would pick up his children from day care and help them throughout the evening with the tasks his wife could not do alone. Thomas would then put the children to bed and return to the Chicago residence. An exchange between plaintiff's counsel and Mr. Walsh highlights his findings as to Thomas's intent.

> "MR. SALTZMAN [petitioner's counsel]: You believe that they were, based on your investigation, that the Thomas family was legitimately trying to sell their home in Arlington Heights, correct?
>
> MR. WALSH: Yes.
>
> MR. SALTZMAN: And that Mr. Thomas'[s] intent was, once that home was sold, that he and his family were going to live in a home in the service area, correct?
>
> MR. WALSH: Yes.
>
> MR. SALTZMAN: And that the Oleander address was a way for him to live in the service area until the point that the home could be sold, correct, the Arlington Heights home could be sold, correct?
>
> MR. WALSH: Yes.
>
> MR. SALTZMAN: And the family could be reunited in the City correct.
>
> MR. WALSH: Yes.
>
> MR. SALTZMAN: This was not a situation where he intended to maintain two separate residences ad infinitum, correct?
>
> MR. WALSH: There was no–there was nothing that I uncovered that would indicate that."

Walsh also testified that the Arlington Heights home was a single-story ranch home that appeared to be handicap accessible because there was a ramp in the garage leading to the house, which prohibited the parking of a vehicle.

¶ 17                                2. Testimony of Mrs. Jennifer Thomas

¶ 18        Mrs. Thomas testified she has cerebral palsy, which prohibits her from independently taking care of herself and her children. Mrs. Thomas has required the use of a power wheelchair for the last 11 years to move without the assistance of others. Due to these limitations, she is not a licensed driver and has difficulty performing daily tasks without the help of her spouse. Because of the residency requirement, approximately 30 days after Thomas was hired the family put their Arlington Heights home up for sale during the worst housing market in 27 years.

¶ 19        She testified that in December 2009, Thomas left Arlington Heights to live in Chicago. The Chicago residence was not accessible to her because it had stairs. After her husband moved she still required his assistance to: (1) get the children ready; (2) take her to the train; (3) bring her back to Arlington Heights; (4) pick up the children from day care; (5) prepare the evening meal; and (6) put her and the children to bed. She testified that after completing those tasks, Thomas would go back to the Chicago residence at roughly 8:30 p.m. each evening and return the following day at 5:30 a.m.

¶ 20        On cross-examination, Mrs. Thomas testified that the Chicago residence was approximately 10 miles from the Arlington Heights home. No one came to assist her overnight after her husband left to the Chicago residence. Before a failed 2009 closing on the Arlington Heights home, she had looked for day care and other school options for the twins in Glenview. One Glenview school was prepared to enroll the children beginning in January 2010, after Christmas break. She explained that they looked at the housing options in Des Plaines, Glenview, Niles, Skokie and Northbrook with the Glenview property being the best option for her needs.

¶ 21                                3. Testimony of Mr. Daniel Thomas

¶ 22        Thomas testified that although the Arlington Heights home was in Cook County, it was not in the CTA service area. He looked into housing options in Glenview, Park Ridge, Niles, Des Plaines and Skokie. He placed their Arlington Heights home on the market and reduced the price of the home four or five times. The failed sale in 2009 would have resulted in a loss. He was willing to sell at a loss because he wanted get a new house for his family and to live in the service area. When the sale failed in December 2009, he moved to the Chicago residence, which was not accessible to his wife because of the stairs and narrow doorways. His intention was to live permanently in the service area and not move back to Arlington Heights. He had no intention to reside again at the Arlington Heights house. His intent was to reside in the Chicago residence until he could secure new housing in the service area because there was no other financially feasible option based on the family's requirements and circumstances.

¶ 23        Thomas stated he moved to Chicago as a matter of circumstance but still needed to take care of his wife and children. He never thought of divorce or separation for the purpose of trying to satisfy the residency requirement. After his move to Chicago, he obtained a new

driver's license, changed his voter's registration, paid for utilities at the Chicago residence and slept there Monday through Thursday. He tended to the Chicago home by cleaning it and making sure it was maintained. He stated that his wife's testimony as to his schedule of going back and forth to the Arlington Heights home to help his family was accurate.

¶ 24 On cross-examination, Thomas testified that they planned to sell the suburban residence and move to a different house in the service area. They were looking to purchase a specific home in Glenview which would have accommodated his wife's disability because it had neither a basement nor stairs. His wife did not visit the Chicago residence because it was not wheelchair accessible and it would have been costly to make it accessible for his wife. The Chicago residence was owned by his stepfather, and he did not pay rent because his stepfather's belongings were stored on the premises. He was the only person residing in the home. At the time of the section 28 hearing, it had been sold.

¶ 25 In response to questioning from the panel members, Thomas said he left his previous employment to work for the CTA for the same compensation. He was comfortable with the idea of moving to the service area. The Chicago residence was listed for sale while he resided there and if it sold before the Arlington Heights home, he would reside in another apartment within the service area. Thomas fixed up the Arlington Heights home at the suggestion of his realtor to help sell the property. He denied there were any declarations of mold or leaks in the suburban home during the course of the failed sale. He testified that the Chicago residence was not accessible for his wife because of the stairs, the basement and structural issues with the walls and the doorway prohibiting entry into the home by a wheelchair-bound individual.

¶ 26         B. Post Section 28 Hearing and Decision

¶ 27 Posthearing briefs were submitted in August 2010. Thomas argued that the underlying facts are undisputed and the case turns on the issue of his intent. Thomas pointed to the CTA's witness agreeing that Thomas intended to reside in Chicago and comply with the residency requirement. Thomas asserted that nothing in the facts and testimony supports the notion that he engaged in a sham by moving to Chicago in December 2009, continuing to assist his family and changing his residency. Further, he argued: (1) the CTA has not met its burden of proof; (2) a determination that Thomas had two residences because he did not divorce his wife and/or abandon his family violates his fundamental rights under the due process clause; and (3) the CTA's interpretation of the ordinance prevents Thomas from caring for his disabled wife and helping her care for their children and is in violation of the Americans with Disabilities Act (42 U.S.C. § 12112(b)(5) (2006)).

¶ 28 The CTA argued that Thomas had a second residence in Chicago because he was sleeping there overnight; however, the Chicago residence did not qualify as his domicile because "his wife could not live there and, at any rate, the Oleander house was for sale." The CTA argued the termination was proper, first, because Thomas did not have his domicile in Chicago, he was not fulfilling the purpose of the ordinance. Second, the CTA did not have a duty to accommodate Mrs. Thomas's disability, a nonemployee. The CTA further argued that Thomas could have chosen a domicile in the service area that was wheelchair accessible; however, he chose not to because: (1) he could not sell his Arlington Heights home during the grace period; (2) he felt he could not afford to rent another residence while paying a mortgage; and (3) he was living at the Chicago house without paying rent. The CTA concedes that the residency requirement imposed an economic burden on Thomas but asserts

it did not force him to abandon his family or separate from his wife. On January 12, 2011, the Board enacted ordinance number 011-1 (Chicago Transit Authority Ordinance No. 011-1 (eff. Jan. 12, 2011)), sustaining petitioner's termination. The ordinance provided that the Board considered the report of the hearing committee, together with the transcript of the proceedings, adopting them as part of the minutes of its January 12, 2011 session. The Board dismissed Thomas's section 28 complaint and sustained the termination. Subsequently, petitioner filed a writ of *certiorari* with the circuit court of Cook County requesting review of the Board's decision, arguing that it was against the manifest weight of the evidence and a violation of public policy.

¶ 29    On July 17, 2012, the circuit court affirmed the termination of petitioner's employment finding the Board's decision was neither "1. against the manifest weight of the evidence; 2. clearly erroneous; nor, 3. contrary to the law for the reasons stated on the record."

¶ 30    This timely appeal followed.

¶ 31                                ANALYSIS

¶ 32    As a preliminary matter, plaintiff requests we remand this case to the Board to issue written findings of fact. Plaintiff asserts the Board issued a conclusory finding sustaining the termination order without explanation. He argues an agency's decision must set forth what evidence was accepted or rejected so that the basis of the decision can be clearly and adequately disclosed and reviewed. He contends that without written findings of fact or conclusions of law our review is hindered. The CTA responds arguing the record contains the hearing testimony, the original documents stemming from Thomas's hiring, the internal investigation, the notice of termination and request for the section 28 hearing. The CTA also argues that Thomas did not raise this issue at the circuit court and, therefore, this basis for remand is waived.

¶ 33    We find Thomas did not waive this argument because it was specifically raised and discussed before the circuit court. We also find that the record provides a sufficient basis to conduct a meaningful review of the issues on appeal. There is no dispute over the facts and circumstances giving rise to the termination order and the Board's decision. The CTA issued a notice of termination on February 19, 2010 and the parties agree the CTA terminated Thomas's employment based on the OIG's report and the inspector's findings. The record includes the CTA's documentation leading to his termination, a transcript of the testimony at the May 10, 2010 hearing before the Board and the parties' posthearing briefs. There is no conflicting testimony involved and the parties agree there is no issue of witness credibility. Accordingly, we find we have a sufficient record to review the decision of the Board.

¶ 34    Turning to the merits of the appeal, plaintiff first argues the Board's decision sustaining the termination was clearly erroneous because the undisputed evidence demonstrates that Thomas's domicile was located within the CTA service area and complied with the residency requirement.

¶ 35    This is a judicial review of an administrative decision brought before the circuit court of Cook County on a writ of *certiorari*. Chicago Transit Authority Ordinance No. 88-81 (eff. June 1, 1988) provides that after a section 28 hearing "the decision of the Board shall be final and not subject to review." Where an agency does not adopt the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)) and offers no form of other review, a writ of

*certiorari* is the "general method for obtaining circuit court review of administrative actions." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). The standard of review for an action brought on a writ of *certiorari* is "essentially the same as those [actions brought] under the Administrative Review Law." *Id.*

¶ 36 Thomas challenges the Board's ordinance sustaining the termination of his employment and the order of the circuit court affirming the Board's ordinance. However, we review the decision of the administrative agency, not the order of the circuit court. *Wolin v. Department of Financial & Professional Regulation*, 2012 IL App (1st) 112113, ¶ 19. Therefore, our review is limited to the decision of the Board as reflected in the ordinance.

¶ 37 We review all questions of law and fact contained in the record. *Soto v. Board of Fire & Police Commissioners*, 2013 IL App (2d) 120677, ¶ 22. An agency's determinations of fact are held to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010). We do not reweigh the evidence but rather we determine whether the agency's decision is "just and reasonable in light of the evidence presented." (Internal quotation marks omitted.) *Soto*, 2013 IL App (2d) 120677, ¶ 22.

¶ 38 The applicable standard of review from a decision of an administrative agency is dependent upon whether the appeal presents a question of fact, a mixed question of fact and law or a pure question of law. *Wolin*, 2012 IL App (1st) 112113, ¶ 37. Questions of fact are reviewed under the manifest weight of the evidence standard. *Id.* ¶ 19. Mixed questions of law and fact are reviewed under the clearly erroneous standard. *Nichols v. Chicago Transit Authority Hardship Committee*, 338 Ill. App. 3d 829, 831 (2003). Lastly, an agency's decision regarding a question of law is reviewed *de novo*. *Wolin*, 2012 IL App (1st) 112113, ¶ 19.

¶ 39 Illinois courts have used all three standards of review in determining the residency of an individual. See *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303, 326-27 (2011). The clearly erroneous standard of review is applied when the facts are "admitted or established, the controlling rule of law is undisputed" and the issue is whether the facts satisfy the legal standard. (Internal quotation marks omitted.) *City of Champaign v. Madigan*, 2013 IL App (4th) 120662, ¶ 26. "An agency's decision is 'clearly erroneous' when the reviewing court is left with a firm and definite conviction that the agency has committed a mistake." *City of Sandwich v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 1006, 1008 (2011); *Cinkus v. Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). Under the clearly erroneous standard, more deference is given to the agency's decision than under the *de novo* standard, but less deference than the manifest weight of the evidence standard. *Maplewood Care, Inc. v. Arnold*, 2013 IL App (1st) 120602, ¶ 25.

¶ 40 In this instance we review the Board's decision under the clearly erroneous standard. The parties agree that there is no dispute as to the underlying facts or the credibility of the witnesses and there is an absence of competing testimony. The first question on appeal is whether the Board erred in determining that Thomas did not satisfy the CTA's residency requirement based on the undisputed facts and evidence presented to the Board. This question is factual in part because it requires us to consider whether the facts presented support the Board's decision. It is also legal in part because residency is a legal concept which requires judicial interpretation. See *Maksym*, 242 Ill. 2d 303.

¶ 41 CTA Ordinance No. 005-201, establishing the residency requirement for nonunion CTA workers, like Thomas, provides that an employee's residence "shall be defined to be the

actual domicile of the individual. An individual can have only one domicile." Chicago Transit Authority Ordinance No. 005-201(j) (eff. Dec. 14, 2005). "[D]omicile *** has been defined as 'the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning.' " *Fagiano v. Police Board*, 98 Ill. 2d 277, 283 (1983) (quoting *Peirce v. Peirce*, 379 Ill. 185, 192 (1942)). "Residence" has been considered synonymous with the term "domicile." *Id*. *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 654 (1983). However, "residence" does not have a fixed or constant meaning. *Fagiano*, 98 Ill. 2d at 282.

¶ 42    To avoid any confusion, we note that the CTA ordinance defines "residency" to be a person's "domicile" and, further, a person can have only one domicile. "Residency" and "domicile" are synonymous under the ordinance. Thus, to establish residency, or domicile, there are two requirements: (1) physical presence and (2) intent to remain in that place as a permanent home. *Maksym*, 242 Ill. 2d at 319. In this case, the parties agree the first requirement is satisfied because Thomas had a physical presence at the Chicago residence. The CTA conceded the OIG report established that Thomas had an indisputable physical presence at the Chicago residence. OIG investigator Walsh's testimony confirmed Thomas resided in the CTA service area at the Chicago home. The meat of the CTA's argument is that, although Thomas had established his residence in the Chicago home, it was not deemed sufficient for purposes of complying with the ordinance because his family lived in a separate residence. Therefore, the question is whether Thomas satisfied the second prong of the residency test: Did Thomas intend to establish his permanent residence in the service area?

¶ 43    In order to determine a person's intent to establish a new domicile or residence, we must consider whether: (1) that person intended to abandon the prior domicile; and (2) that person intended to establish a new domicile. The establishment and abandonment of a residence is "largely a question of intent." *Id.* at 326. A person's intent is primarily shown from his acts about which that person is "absolutely competent to testify *** though such testimony is not necessarily conclusive." *Id*. In determining residency the "issue to be decided by a board is principally of determining the employee's intent." *Fagiano*, 98 Ill. 2d at 287. Intent is measured by both surrounding circumstances and declarations of the individual. *Walsh v. County Officers Electoral Board*, 267 Ill. App. 3d 972, 976 (1994). The question of residency is an "individualized determination" and all factors present must be considered by a board "[b]ecause intent may be manifested in ways too numerous to simply be listed." *Fagiano*, 98 Ill. 2d at 287.

¶ 44    There is no dispute that Thomas was residing with his wife and children in Arlington Heights, Illinois, outside of the CTA service area, prior to December 2009. Once residency has been established, the question is no longer physical presence but whether the individual abandoned the prior residence. *Maksym*, 242 Ill. 2d at 319; *O'Boyle*, 119 Ill. App. 3d at 654. A person may not have more than one domicile and once a domicile is established it remains until a new domicile is acquired. *O'Boyle*, 119 Ill. App. 3d at 654. The issue, therefore, is whether Thomas abandoned his established domicile in Arlington Heights and acquired a new domicile in Chicago in December 2009.

¶ 45    Thomas and his wife testified that upon his moving from Arlington Heights to the Chicago residence, he had no intention to permanently return to Arlington Heights. Rather, his intent was to move into the CTA service area and live there permanently. The Thomases and Investigator Walsh testified the Thomases put their Arlington Heights home on the

market almost immediately after he began working at the CTA in 2008; they were looking for homes in the service area; they searched for suitable schools for their children; and his stated intention was to live in the Chicago residence until he could sell the Arlington Heights home and move his family into an accessible residence within the CTA service area. The CTA does not dispute the contents or the representations made in the section "A" and section "B" proof of residency documents that Thomas submitted. The testimony of Thomas and the CTA investigator that he actually resided at the Chicago home, he had a lease with the owner of the residence, he received mail at the Chicago address, and he changed his legal address to and paid utility bills for the Chicago residence are completely consistent. Investigator Walsh did not refute: (1) Thomas's stated intention to never live in Arlington Heights again; and (2) Thomas's necessary presence at the Arlington Heights home during certain hours on certain days to care for his wife and children.

¶ 46    Similar to this case, in *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303 (2011), the question was whether a candidate for elective office was an eligible resident where objectors claimed he had abandoned his Chicago residence when he moved to Washington, D.C., to serve as a federal official for a lengthy period of time. The candidate claimed he never abandoned (intended to leave) his Chicago home as evidenced, in part, by the continued ownership of his home, payment of local real estate taxes, and maintenance of his voter and vehicle registrations in Chicago. This evidence required the challenger to overcome the presumption of a Chicago residency and the declaration of the candidate's intent to remain in Chicago. *Id.*

¶ 47    Reviewing Thomas's stated intention, his acts and the surrounding circumstances (*Maksym*, 242 Ill. 2d at 316), in addition to Investigator Walsh's report and testimony, we find the Board failed to establish that Thomas did not abandon his Arlington Heights residence and establish his residence in the service area. *Walsh*, 267 Ill. App. 3d at 975 (surrounding circumstances shall be accorded more weight than simple declarations of intent). It was not refuted that Thomas was residing at the Chicago residence. The fact that he made early morning and late evening commutes to and from the suburbs to attend to the needs of his disabled wife and small children during the week and that he spent the weekends with them does not negate his intent to abandon his Arlington Heights residence. Neither the ordinance nor precedent compels a conclusion that living up to his family responsibilities equates to a lack of abandonment.

¶ 48    The CTA also argues that even if Thomas did abandon his Arlington Heights residence, he did not sufficiently establish a new residence within the service area as required by the ordinance. Specifically, the CTA argues that Thomas did not establish a new residence in Chicago because: (1) the Chicago residence was for sale and, therefore, was a temporary residence; and (2) his wife and children reside outside the service area where he visited on a regular basis.

¶ 49    Staying in a temporary residence to comply with a residency requirement while looking for permanent housing is sufficient to establish a new domicile. *Dillavou v. County Officers Electoral Board*, 260 Ill. App. 3d 127 (1994). In *Dillavou*, a candidate for the office of state representative resided in temporary housing while looking for a new home in the district where he was required to live. In reviewing the circumstances to determine residency, we found there was sufficient evidence of residency in the district because there was undisputed evidence that the candidate made an offer to purchase a home in the district that, if

consummated, would have dispelled any question of residency. *Id*. at 133-34. We also rejected the petitioners' contention that because the candidate admittedly lived in a temporary residence, he could not qualify as a resident of the requisite district. *Id*. We stated that "[a] person can acquire a domicile if he is personally present in a place and elects that as his home even if he never intends to remain in that physical structure on a permanent basis." *Id*. at 133.

¶ 50    In this case, the evidence supports a similar result as *Dillavou.* Here, the parties agree that Thomas intended to live in the service area and that his Chicago residence was temporary until he found new housing suitable for his immediate family in the service area. Similar to *Dillavou*, here there was no contrary evidence that the suburban home was continuously on the market from almost immediately after he began working for the CTA. Furthermore, the potential sale of Thomas's Arlington Heights home and the attempted purchase of a Glenview home in the service area was unchallenged by the CTA. Had the sale of the Thomas home and purchase of the Glenview home occurred, any question of Thomas's residency would have been quickly dismissed. Therefore, we disagree with the CTA and hold that even though Thomas's undisputed residency in the Chicago dwelling was temporary, absent any persuasive evidence to show it was a sham, these are circumstances that support a conclusion that he had the intention to establish his residency in the CTA service area.

¶ 51    The facts that the Chicago residence was owned by a relative, that he paid the utilities but no rent, and that it was listed for sale are not determinative, given that Investigator Walsh all but testified that there was no suggestion this was evidence of a pretext. Thomas should not be penalized for a kindness extended to him by a family member. Even if the Chicago residence was sold, that would only mean Thomas would be required to establish another residence within the service area. Living in a temporary residence in order to comply with a residency requirement while looking for permanent housing is sufficient to establish a new domicile. *Id*.

¶ 52    Second, Thomas argues that the CTA was acting according to an unwritten policy, referenced by the investigator, to the effect that an employee cannot maintain a domicile separate from his or her spouse, regardless of his specific circumstances. The CTA argues that an employee cannot have a separate domicile from his or her spouse.

¶ 53    The residency requirement of Ordinance No. 005-201, however, specifically targets the individual employee and does not encompass the employee's family when defining residency. Section (j) provides " 'Residence' shall be defined to be the actual domicile of the *individual*. An *individual* can have only one domicile"; and section (k) provides in its entirety: "An *employee's* failure to reside within the residency area shall be considered cause which is detrimental to the service and grounds for discharge." (Emphases added.) Chicago Transit Authority Ordinance No. 005-201(j), (k) (eff. Dec. 14, 2005). None of the documents provided to Thomas before or during his employment indicate that an employee's spouse or children were required to maintain the same residency as the employee in order to be in compliance with the ordinance.

¶ 54    The CTA's investigator testified the CTA's policy is that an employee's domicile is always with his or her spouse. This policy statement was expanded in the circuit court where CTA counsel stated the policy is that an employee's residence is automatically deemed to be that of the family, regardless of the employee's actual residence. In effect, this policy would give full effect to the family's circumstances and totally ignore the circumstances and the

- 12 -

employee's declared intent of residency. The CTA argues that *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648 (1983), supports this position.

¶ 55    In *O'Boyle*, a Chicago firefighter lived with his wife and children in a home he owned in Palos Hills. *Id*. at 650. His wife refused to move and the couple legally separated. *Id*. O'Boyle moved to his parents' residence in Chicago while his wife and children lived in the suburban residence. *Id*. They had a third child a year after the separation, reconciled and moved the family to Chicago. *Id*. at 650-52. However, before that move, charges had been brought against O'Boyle for violating the city's residency requirement. *Id*. at 652. Investigators observed O'Boyle at the suburban residence five times over a two-month period and neighbors stated that O'Boyle lived in the suburban residence. *Id*. at 651-52. On four occasions O'Boyle was seen leaving the Palos Hills home at 5:45 a.m. and once at 2 p.m. O'Boyle testified that he initially stayed at the Chicago residence but over the course of a few months he started staying in the suburban residence more often until he reconciled with his wife. *Id*. at 652. During this time, O'Boyle financially supported the suburban household. *Id*. The hearing officer and personnel board found that although evidence was presented establishing residence in Chicago, there was more evidence establishing his actual residence in Palos Hills and imposed a 60-day suspension. *Id*.

¶ 56    We found that the evidence against O'Boyle was sufficient to uphold the personnel board's decision because O'Boyle did not intend to permanently move to the Chicago residence, but rather he merely intended to comply with the residency requirement. *Id*. at 656. We noted that generally changing a residence to comply with an employer's residency requirement does not evidence the intent required to change the employee's domicile. *Id*. Rather, there must be an intent to make the new residence a permanent home to establish a new domicile. *Id*. at 655-56.

¶ 57    Three years later we decided *Raczkowski v. City of Chicago*, 142 Ill. App. 3d 378 (1986). There the discharged employee owned a house in the suburbs, where his wife and children lived, and he also had an ownership interest in an apartment in the city. *Id*. at 379. He used his Chicago address for his voter and automobile registrations and bank accounts. *Id*. Investigators did not see him at the Chicago residence on four occasions; however, he was observed during all eight surveillance visits at the suburban residence. *Id*. The surveillances lasted no more than 2½ hours. *Id*. The circuit court affirmed the administrative finding that Raczkowski did not reside in the city. *Id*. at 378. The circuit court made statements suggesting that the only way Raczkowski could comply with the city's residency requirement was to divorce his wife. *Id*. at 382.

¶ 58    This court reversed the personnel board, finding its ruling was against the manifest weight of the evidence because Raczkowski established a new domicile in the city. *Id*. Although Raczkowski had been observed many times at the suburban home, we noted that the he gave reasonable explanations as to why he was at the suburban address. *Id*. at 381. We also noted that although the suburban neighbors interviewed supported the city's contention that Raczkowski lived with his spouse, no unfavorable information was obtained from his Chicago neighbors. *Id*. We found that Raczkowski's "continued interaction with his family and other evidence of *** involvement with the Lincolnshire home," including continued support of his family, did not evidence an intent to make the Lincolnshire home his residence. *Id*. Further, we found that it would be against public policy to mandate an employee "divorce his spouse and abdicate all responsibility for his family, unless otherwise

- 13 -

ordered by a court, solely to be able to establish that he had a separate residence in the city." *Id*. at 382. In finding Raczkowski satisfied the city's residency requirement, this court relied on Raczkowski's testimony as to the circumstances and his stated intent in abandoning the Lincolnshire residence and to his intention to reside in Chicago. *Id*. at 381-82.

¶ 59    We find Thomas's circumstances are distinguishable from those in *O'Boyle* and more in line with *Raczkowski*. Here, Thomas candidly and without contradiction testified before the Board that he and his family at all times desired and welcomed the move, intending to permanently reside in the service area. He placed the family home on the market almost immediately after beginning employment with the CTA. The CTA agreed that Thomas intended to permanently reside in the CTA service area. In *O'Boyle* the evidence showed the family refused to relocate to Chicago until years later and after the investigation began into O'Boyle's domicile and the facts showed Mr. O'Boyle had resumed living in the Palos Hills residence while working for the city. The decision in *O'Boyle* turned on whether O'Boyle had an intention to reside in Chicago permanently which could not be shown under those facts and circumstances. Here, the facts and circumstances show Thomas's intent to abandon one residence and to permanently reside in the service area.

¶ 60    We find the Thomases' testimony concerning his presence at the Arlington Heights address was reasonable and not contradicted. Thomas, like *Raczkowski*, explained the special circumstances which required his presence during certain times at the Arlington Heights home. Similar to *Raczkowski*, "the surrounding circumstances shall be accorded more weight than simple declarations of intent." *Walsh*, 267 Ill. App. 3d at 976-77 (finding that "moving into a one-room efficiency apartment on a month-to-month basis does not negate intent to reside there" for the purpose of determining a permanent abode and "while evidence of the residence of a party's spouse and children is relevant, it by no means solely supports a conclusive finding of permanent residence"). There was no evidence presented by the CTA that contradicts plaintiff's and his wife's testimony.

¶ 61    Although the *Raczkowski* court relied on the employee's testimony, stated intent and the facts and circumstances of his family life in finding he established a new domicile in the city, here, the CTA Board did precisely the opposite. Thomas testified that he had a residence in Chicago, he intended to permanently reside in Chicago and that he was trying to sell his Arlington Heights home to make that a reality. The CTA did not contradict Thomas's testimony concerning his presence during certain times of the day in Arlington Heights in order to provide care for his wife and children under very specific circumstances. The CTA's finding that Thomas was not domiciled in Chicago rested solely on the fact that Thomas's family continued to reside in Arlington Heights. Any suggestion that Thomas needed to formally separate from his family and abdicate his family responsibilities in order to perfect an abandonment of his suburban residency would be contrary to public policy. *Raczkowski*, 142 Ill. App. 3d at 382. Accordingly, we find the Board's finding that Thomas did not reside in the service area was clearly erroneous.

¶ 62    In summary, Thomas's uncontradicted testimony clearly showed that it was his intention to permanently abandon the Arlington Heights home and permanently live in the service area, first in a temporary home and later in another home accessible to his wife, also within the service area. The uncontested testimony showed Thomas's acts of: (1) placing the Arlington Heights home for sale immediately after beginning work for the CTA; (2) agreeing to sell it at a loss of $30,000; (3) spending time and money preparing the house for sale; and

(4) attempting to buy the Glenview home and enroll the children in the new school in January 2010. This is persuasive evidence of his intent to abandon his Arlington Heights residence and to permanently reside in the CTA service area. The national and local economy was in the midst of the "Great Recession" and the housing market was in a severely depressed state. It is entirely plausible Thomas would have trouble selling his home so that he could buy an accessible property in the service area. A reasonable inference drawn from this record is that Thomas was sincere in his commitment to adhere to the residency requirements of his employment and he complied with that requirement by abandoning his former home to temporarily live in the service area until a permanent home could be acquired. There is similar evidence that Thomas intended to establish permanent residence in the service area. His conduct in providing and caring for his disabled wife and their young children evidences a commitment to abide by the requirements of the position and a commitment to provide for his family. The fact that a person lives apart from his spouse or other family members is not a sufficient basis, standing alone, to defeat the stated intention of a declared permanent residency or domicile.

¶ 63      Throughout its brief, the CTA argues that because Thomas failed to do certain acts, these failures evidence his lack of intent to make Chicago his primary residence. There is no point in discussing what could have been. We do not determine one's residence based upon what a person could have done to establish a new residence. We rely on the record to show what the individual did and whether those actions are sufficient to establish both physical presence and intent to remain at the new residence. *Maksym*, 242 Ill. 2d at 314 (the court determines residence by considering the person's intent, acts and the surrounding circumstances).

¶ 64      After having carefully reviewed the Board's decision, we are left with a definite and firm conviction that a mistake has been committed. We hold the Board's decision, which found Thomas failed to meet the residency requirement enunciated in CTA Ordinance No. 005-201 is clearly erroneous. As such, we reverse that decision and the order of the circuit court affirming the Board's decision.

¶ 65      Having determined that the Board's ordinance was clearly erroneous and must be reversed, we need not address the additional challenges to the Board's ruling.

¶ 66                                              CONCLUSION

¶ 67      For the foregoing reasons, the decisions of the circuit court of Cook County and the Chicago Transit Authority Board are reversed.

¶ 68      Reversed.