2025 IL App (1st) 250133-U

No. 1-25-0133

Order filed February 11, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RENA POULOS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Candidate-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 24 COEL 36 |
| | ) | |
| BRADLEY SMITH, KAREN HOLCOMB, and | ) | Honorable |
| RODRICK JEFFERSON, in their capacities as members | ) | Tracie R. Porter, |
| of the Municipal Officers Electoral Board for the Village | ) | Judge, presiding. |
| of Riverdale, and ALBERT JONES, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| LARRY DEAN, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse the circuit court's judgment and uphold the Electoral Board's decision
            to disqualify Rena Poulos from the ballot for the Democratic primary for Riverdale
            village president based on the Electoral Board's finding that Poulos is not a resident

of Riverdale. Poulos's name shall not appear on the ballot for the February 25, 2025, primary election.

¶ 2    This appeal concerns the February 25, 2025, Democratic primary for village president of Riverdale, Illinois. The Municipal Officers Electoral Board for the Village of Riverdale (the Board) disqualified Rena Poulos from the ballot because it found that that she was not a resident of Riverdale as required by section 3.1-10-5(a) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(a) (West 2022)). The circuit court reversed the Board's decision and one of the objectors appealed. For the following reasons, we reverse the judgment of the circuit court and order that Poulos's name shall not appear on the ballot for the February 25, 2025, primary. Further orders regarding the ballot are below.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Nomination Papers and Objection

¶ 5    Poulos seeks to be a Democratic candidate for village president of Riverdale. The Democratic primary is on February 25, 2025, and the general election is on April 1, 2025. On October 28, 2024, Poulos filed a statement of candidacy, a statement of economic interests, and voter petitions, which attested that she resides on South Lowe Avenue in Riverdale (the Riverdale property).[1]

¶ 6    The objectors filed a petition alleging that Poulos did not reside at the Riverdale property for the required statutory period. They contended that Poulos resided on South 81st Avenue in

---

[1]We have omitted exact addresses for the sake of privacy and security. Exact addresses are not necessary to understand the facts of this appeal, which concerns whether Poulos resides in Riverdale or Palos Park.

Palos Park (the Palos Park property) and was therefore not statutorily qualified to hold the position of Riverdale village president.

¶ 7     Poulos filed a motion to strike and dismiss the objectors' petition, arguing in relevant part that she had resided in Riverdale "for well over a year at the time her nomination papers were filed." As exhibits, Poulos attached her affidavit, voting records, and personal identification as support for her assertion that she has lived at the Riverdale property since 1990 and owns the Palos Park property as an investment.

¶ 8                                B. Hearing

¶ 9     The electoral board held a hearing on the objectors' petition on December 17, 2024.

¶ 10                              1. Rena Poulos

¶ 11                          a. The Riverdale Property

¶ 12    Poulos testified that she lived on South Lowe Avenue in Riverdale and had lived there since 1990, when she was a child. Poulos's family (or their family company) owned the Riverdale property until Poulos acquired it from her grandmother in 2020. At the time of the hearing, Poulos was paying an equity line of credit on the Riverdale property. Between February and December 2024, Poulos spent 130 to 330 nights at the Riverdale property. She received mail at the Riverdale property, such as mortgage statements, cell phone bills, and "Navy federal" mailings. Poulos registered to vote at the Riverdale property in 1999 and never voted anywhere other than Riverdale.

¶ 13    A friend named Brandon Mathis lived at the Riverdale property with Poulos. Poulos and Mathis did not have a lease agreement at the time of the hearing, but they may have had one in the past. Mathis did not pay Poulos rent, but he contributed to utility bills in amounts up to $2000.

¶ 14    Cook County Treasurer records show that Poulos paid taxes on the Riverdale property every tax year from 2019 through 2022.[2] These records identify Poulos's mailing address as located on 127th Street in Palos Heights. Records for 2018 through 2023 do not include the words "HOMEOWNER EXEMPTION 10,000."[3]

¶ 15    Poulos submitted several applications to the Village of Riverdale to obtain a rental property license for the Riverdale property. On September 26, 2018, Poulos submitted an application that identified her mother, Tracie, and a child as occupants of the Riverdale property. The form instructed Poulos to list every occupant of the building, including the landlord, but Poulos did not list herself as an occupant. Tracie signed a "Crime Free Lease Addendum" as part of this application. On October 4, 2019, Poulos submitted another application and a "Crime Free Lease Addendum" signed by Tracie. On October 25, 2021, Poulos submitted an application that identified Mathis and a child as the occupants of the Riverdale property; Mathis also signed a "Crime Free Lease Addendum." On October 11, 2022, Poulos submitted an application that identified Mathis as the only occupant of the Riverdale property; Mathis again signed a "Crime Free Lease Addendum." On every application, Poulos listed her mailing address as located on 127th Street in Palos Heights. Poulos testified that a Village of Riverdale employee advised her not to list herself as an occupant of the Riverdale property because she had "multiple properties

---

[2]Unless otherwise indicated, all documents referenced in this summary of the hearing were entered into evidence and are part of the record on appeal.

[3]A homeowner's exemption allows a homeowner to subtract $10,000 from the equalized asset value of their property when calculating its tax value. The homeowner's exemption applies only to one's primary residence that they own and occupy. Once a homeowner has applied for an exemption, it renews automatically every year so long as the homeowner's residency stays the same. See Cook County Assessor's Office, Homeowner Exemption, https://www.cookcountyassessor.com/homeowner-exemption (last visited February 3, 2025); see also 35 ILCS 200/15-175(a), (f) (West 2022).

that [she] was using as her residency" and "c[ould] only have one property without a rental license."

¶ 16    Poulos's Ford F-150 was registered to the Riverdale property. Her driver's license, state identification card, Firearm Owner's Identification (FOID) card, and concealed carry license were registered to the Riverdale property as well. A FOID card issued to Poulos in 2015 lists the address of the Riverdale property. Another FOID card issued to her in 2013 listed the address of her father's company in Chicago, where she was working at the time.

¶ 17                              b. The Palos Park Property

¶ 18    Poulos further testified that her grandparents originally owned the Palos Park property as an investment property and rented it to other relatives. Poulos bought the Palos Park property in 2019 with the intention that it would become her "forever home" where she might get married and raise children. Poulos signed a mortgage on the Palos Park property on January 11, 2019. The mortgage loan application stated that Poulos intended for the Palos Park property to be her primary residence and the mortgage itself required her to use the Palos Park property as her "principal address" within 60 days of signing and to remain there for at least one year. However, Poulos decided not to move to the Palos Park property because the relatives who were living there—Poulos's father, his girlfriend, and her son—had nowhere else to live. In addition, it did not make sense for Poulos, who was single, to move to a six-bedroom house when she already had a house in Riverdale.

¶ 19    Poulos's mother, brother, nephew, and niece moved into the Palos Park property in late 2020 or early 2021. Poulos did not collect rent from them. Between February and December 2024, Poulos spent 50 to 100 nights at the Palos Park property. She kept clothes and toiletries at the Palos

Park property and worked from its home office approximately three days a week. Poulos paid the mortgage on the Palos Park property and the parties stipulated that Wintrust sent mortgage statements addressed to her at the Palos Park property from January 2019 through December 2019. Poulos testified that, at the time of the hearing, she had no intention for the Palos Park property to become her primary residence and it was for sale.

¶ 20    Cook County Treasurer records show that Poulos paid taxes on the Palos Park property every tax year from 2018 through 2023. These records also list the Palos Park property as Poulos's mailing address.

¶ 21    Records for 2019 through 2023 include the words "HOMEOWNER EXEMPTION 10,000." Poulos testified that she did not know whether she took homeowner's exemptions on the Palos Park property. She assumed that "the homeowner's exemption was filed with the mortgage" because she initially planned to make the Palos Park property her permanent home. In addition, Cook County Treasurer records show that Poulos paid taxes on another property in Riverdale, Wabash Avenue, in tax year 2022. Poulos testified that she acquired the Wabash Avenue property at a judicial sale.

¶ 22    These records identify the Palos Park property as Poulos's mailing address and include "HOMEOWNER EXEMPTION 10,000" for 2022 and 2023. Poulos testified that she did not apply for a homeowner's exemption on the Wabash Avenue property; that exemption "was already on the property when [she] purchased it."

¶ 23    ComEd sent electric bills to Poulos at the Palos Park property from January 31, 2023, to November 27, 2024. Poulos testified that the ComEd bills were in her name because her mother did not want the bills in her name. The Village of Palos Park sent water bills to Poulos at the Palos

Park property from February 28, 2019, to October 28, 2024. The Village required the water bills to be in the property owner's name.

¶ 24    Poulos's Jeep Grand Cherokee was registered to the Palos Park property from July 6, 2023, to June 30, 2025. Poulos testified that she registered that vehicle in Palos Park to obtain lower insurance rates because Palos Park is a safer neighborhood than Riverdale.

¶ 25                                    2. Brandon Mathis

¶ 26    Brandon Mathis testified that he is Poulos's friend and has lived with her at the Riverdale property since 2019. Poulos had lived at the Riverdale property for 29 years as of December 2024. Mathis did not have a lease agreement with Poulos but helped pay for bills and groceries in amounts ranging between $400 and $600 per month. Poulos slept at the Riverdale property at least 15 nights per month and at least 4 nights per week.

¶ 27                                    3. Tracie Poulos

¶ 28    Tracie Poulos is Rena Poulos's mother. She testified that she, her son, and grandson lived at the Palos Park property, which Rena owned. Tracie had lived at the Palos Park property for approximately six years at the time of the hearing. Rena never lived at the Palos Park property; she lived at the Riverdale property. Between February and December 2024, Rena slept at the Palos Park property fewer than 20 times, and she occasionally used its home office.

¶ 29                                    4. Lawrence Randle

¶ 30    Lawrence Randle testified that he and Poulos went to high school together and had been friends since 1995. Poulos lived on South Lowe Avenue in Riverdale with Brandon Mathis. Randle visited Poulos's house in Riverdale approximately once every two months between February and December 2024. Poulos also had a bedroom at a house in Palos Park.

¶ 31                                    5. Kynesha Lewis

¶ 32     Kynesha Lewis testified that she and Poulos went to grade school together and had been friends since 1990 or 1991. Poulos lived on South Lowe Avenue in Riverdale along with her family friend Brandon Mathis. Between February and December 2024, Lewis visited Poulos at her home in Riverdale "[t]oo many times to count." Poulos also had an office "at Palos," which Lewis visited two or three times to use the printer. Poulos's mother or nephew sometimes answered the door at the Palos property. Lewis testified that Poulos had not "abandoned" the Riverdale property on South Lowe.

¶ 33                                    6. The Board's Ruling

¶ 34     On December 18, 2024, the Board issued a written order finding that Poulos did not reside in Riverdale during the statutory timeframe and striking her name from the primary election ballot. Specifically, the Board found that Poulos abandoned her residency in Riverdale on October 4, 2019, and took up residency in the Palos Park property on or before February 25, 2024. The October 4, 2019, date appears to be based on the rental license application that Poulos submitted for the 2019-2020 rental year. In addition, the Board found that the testimony of Poulos, Tracie, and Mathis was not credible regarding Poulos living at the Riverdale property after October 4, 2019.

¶ 35                               C. Circuit Court Proceedings

¶ 36     On December 19, 2024, Poulos filed a petition for judicial review in the circuit court. On January 17, 2025, the circuit court reversed the Board's disqualification of Poulos. The court found that although Poulos had "been present at both the Riverdale and Palos Park properties she owns,

including a room to sleep, personal property, car and car registrations, the fact that she has only voted in Riverdale is most compelling as to her intent to have Riverdale as her personal residence."

¶ 37 Objector Larry Dean timely appealed.

¶ 38                                    II. ANALYSIS

¶ 39 The Municipal Code provides that "[a] person is not eligible for an elective municipal office unless that person *** has resided in the municipality at least one year next preceding the election." 65 ILCS 5/3.1-10-5(a) (West 2022)). The objector contends that Poulos "did not reside at the Riverdale address she listed in her nominations papers for the required statutory period in violation of [s]ection 3.1-10-5(a)."

¶ 40                              A. Standard of Review

¶ 41 We review the Board's decision, not the circuit court's decision. See *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929, ¶ 19. The standard of review depends on what is in dispute: the facts, the law, or a mixed question of fact and law. *Id.* ¶ 20. This case presents primarily a question of fact, which is whether Poulos resided in Riverdale or Palos Park during the relevant time. See *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 95 (administrative agency's determination of residency "turned on a question of fact"). We review questions of fact under the manifest weight of the evidence standard. *Thomas v. Chicago Transit Authority*, 2014 IL App (1st) 122402, ¶ 38. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Chaudhary*, 2023 IL 127712, ¶ 95.

¶ 42 The objector contends that the "historical facts" of this case and the controlling law are undisputed, so the issue is whether the undisputed facts satisfy the statutory standard. If the objector is correct, then this case presents a mixed question of fact and law, and we would review

whether the Board's decision is clearly erroneous. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). The Board's decision is clearly erroneous if we are left with the definite and firm conviction that a mistake has been committed. See *id.* While the "historical facts" of Poulos's residency may be undisputed, conflicting inferences may be drawn from those facts. See *Dillavou v. County Officers Electoral Board of Sangamon County*, 260 Ill. App. 3d 127, 131 (1994). However, we need not choose between these two standards of review because our decision would be the same under either standard.

¶ 43                                B. Residency

¶ 44     A "[r]esidence is the principal dwelling place of a person—the place [s]he considers home." (Internal quotation marks omitted.) *Id.* To establish residency as a statutory condition for running for municipal office, two elements are required: (1) physical presence and (2) intent to remain in that place as a permanent home. *Maksym v. Board of Election Commissioners of the City of Chicago*, 242 Ill. 2d 303, 319 (2011). Once residency is established, we presume that it continues, and the burden is on the objecting party to prove that the candidate abandoned her residency. *Id.*; see also *Thomas*, 2014 IL App (1st) 122402, ¶ 44 ("A person may not have more than one domicile and once a domicile is established it remains until a new domicile is acquired."). A "residence is not lost by temporary removal with the intention to return *** but when one abandons h[er] home and takes up residence in another county or election district." (Internal quotation marks omitted.) *Maksym*, 242 Ill. 2d at 319.

¶ 45     Establishment and abandonment are questions of intent. *Id.* We infer intent primarily from a candidate's actions, but a candidate can also testify to her intent, although such testimony is not dispositive. *Id.*; see also *Thomas*, 2014 IL App (1st) 122402, ¶ 43 ("Intent is measured by both

surrounding circumstances and declarations of the individual."); *Delk v. Board of Election Commissioners of the City of Chicago*, 112 Ill. App. 3d 735, 738 (1983) (a person's "acts and surrounding circumstances should be given more weight in making the factual determination of intent."). "The question of residency is an individualized determination and all factors present must be considered by a board because intent may be manifested in ways too numerous to simply be listed." (Internal quotation marks omitted.) *Thomas*, 2014 IL App (1st) 122402, ¶ 43.

¶ 46    Poulos testified that she moved to the Riverdale property in 1990 when she was a child. No evidence contradicted that testimony and there is no indication that Poulos resided elsewhere until at least 2019. Accordingly, we find that Poulos established residency in Riverdale in 1990. So, the question becomes whether Poulos abandoned the Riverdale property for residency elsewhere. According to the Board and the objectors, that occurred in 2019, when Poulos bought the Palos Park property, acquired a homeowner's exemption for it, and then leased the Riverdale property to tenants.

¶ 47    There is no dispute that Poulos bought the Palos Park property in January 2019. There is also no dispute that, in 2019, Poulos planned to move to the Palos Park property as her permanent home. However, Poulos testified that she decided not to move to the Palos Park property because her family members were still living there and had nowhere else to live, and because it was not practical for her to live in a six-bedroom home by herself. Tracie Poulos and Brandon Mathis agreed that Poulos continued to live at the Riverdale property even after buying the Palos Park property and that she never lived at the Palos Park property as her primary residence. Poulos's longtime friends, Lawrence Randle and Kynesha Lewis, also testified that Poulos had always lived at the Riverdale property. No direct evidence contradicted this testimony.

¶ 48    However, we note that the Board found Poulos, Tracie, and Mathis not credible. We give considerable weight to the Board's credibility findings. See *Kouzoukas v. Retirement Board of Policeman's Annuity and Benefit Fund of the City of Chicago*, 234 Ill. 2d 446, 465 (2009).

¶ 49    The circumstantial evidence of abandonment was more closely balanced. For example, one of Poulos's vehicles was registered to the Riverdale property and another was registered to the Palos Park property. Poulos paid the line of credit, mortgage, and property taxes on both properties. Both properties' utility bills were in her name, and she did not collect rent from either property. She received mail and kept clothes at both properties. Poulos argues that this evidence showed she did not abandon the Riverdale property for the Palos Park property. Rather, it suggested she simply had two homes but continued legal residency in Riverdale.

¶ 50    In addition, Poulos's driver's licenses and state identification cards listed the Riverdale property as her address, as did her most recent FOID card. Voting records established that Poulos registered to vote only at the Riverdale property and has voted only from that address since 1999. Specifically, she voted in Riverdale 11 times between 2000 and 2024. There is no indication Poulos has ever voted in any other municipality. Registering to vote and voting in a particular location is a "deliberate assertion of residency" in that location. *Neely v. Board of Election Commissioners for the City of Chicago*, 371 Ill. App. 3d 694, 700 (2007). Moreover, Poulos and Mathis did not have a written landlord-tenant agreement and Mathis did not pay regular rent to her, which suggested that she did not treat the Riverdale property as a true rental property.

¶ 51    However, tax records indicate that Poulos claimed homeowner's exemptions on the Palos Park property from 2019 through 2023 and did not claim homeowner's exemptions on the

Riverdale property during that five year period.[4] These records support the inference that the Palos Park property, not the Riverdale property, was Poulos's primary residence beginning in 2019, because a taxpayer can claim only one homeowner's exemption on the primary residence they own and occupy. In addition, rental license applications for the Riverdale property that Poulos submitted in 2019, 2021, and 2022 listed multiple tenants living at the Riverdale property but never identified Poulos as an occupant, even though the applications instructed her to list every occupant including the landlord.

¶ 52    The only way to reconcile these records with Poulos's claim that she has always lived at the Riverdale property would be to conclude that Poulos's tax filings and rental license applications were inaccurate. Assuming that these records are accurate, they support the following timeline: In 2019, Poulos bought the Palos Park property with the intention to make it her permanent home. Also in 2019, she leased the Riverdale property to tenants and did not occupy that property herself. Therefore, she abandoned the Riverdale property as her primary residence and moved to Palos Park, just as she intended to do.

¶ 53    We recognize that the evidence of abandonment was close. We agree with the circuit court that Poulos's voting history supported her claim of residency in Riverdale and the Board appears to have ignored that evidence. However, Poulos's tax records and rental license applications are compelling evidence that, in 2019, she abandoned the Riverdale property for the Palos Park property and leased the Riverdale property to tenants. Therefore, we cannot say that the Board's decision was clearly erroneous. We emphasize that the law requires us to take the Board's factual

---

[4]The Board's order states that Poulos "elected to take a home owner's exception [*sic*] for the Palos Home" and "also maintained the home owner's exception [*sic*] for the Riverdale Home." That is incorrect. There is no indication that Poulos claimed a homeowner's exemption for the Riverdale property at any time relevant to this case.

findings as *prima facie* true, and "there need only be some competent evidence in the record sufficient to support [its] findings." See *Dillavou*, 260 Ill. App. 3d at 134. We cannot discard the Board's findings merely because we might draw different interferences from the facts. See *id.*

¶ 54     We note that the objector frames the issue as whether Poulos established residency in *Palos Park* and ever abandoned *that* residence. We disagree. The question is whether Poulos was, during the relevant statutory period, a resident of Riverdale such that she is qualified to hold office in Riverdale or abandoned her Riverdale residence and established a new residence in Palos Park. See *Thomas*, 2014 IL App (1st) 122402, ¶¶ 43-44. It is undisputed that Poulos's original residency was in Riverdale. Once residency is established, it continues, and "the test is no longer physical presence but rather abandonment." *Maksym*, 242 Ill. 2d at 319. Because Poulos initially established residency in Riverdale, the question is whether she abandoned the Riverdale property, not whether she abandoned the Palos Park property.[5] In any event, there is no indication that Poulos abandoned residency in Palos Park and returned to Riverside.

¶ 55     Poulos's memorandum does not address the homeowner's exemptions or rental license applications. It argues that the objector "completely disregard[ed] the unrefuted fact that [Poulos] purchased the Riverdale property in her own name in 2020." However, Poulos testified that she "didn't officially buy" the Riverdale property. Rather, "[she] got it from—[her] grandmother quit-claim deeded it." Accordingly, we find that Poulos has failed to establish that the Board's decision was against the manifest weight of the evidence or clearly erroneous.

¶ 56                                    III. CONCLUSION

---

[5]As a hypothetical example, whether Poulos abandoned the Palos Park property for a property in, say, Palos Heights would be irrelevant because Poulos would not reside Riverdale in either case.

¶ 57 Accordingly, we reverse the judgment of the circuit court of Cook County and order that Rena Poulos's name shall not appear on the ballot for the February 25, 2025, Democratic primary for Riverdale village president. We further order that if the Board is unable to remove Poulos's name from ballots before the February 25, 2025, primary, every person taking a ballot in that election shall be given a written notice, to be initialed by the voter and a judge of elections, that Poulos has been found disqualified to run for village president, that she is no longer a candidate, and that votes cast for her will not be counted. See *Jackson v. Board of Election Commissioners of the City of Chicago*, 407 Ill. App. 3d 837, 848 (2011) (reversed on other grounds). We further order that any votes cast for Poulos on absentee ballots or early voting ballots shall not be counted. See *id.*

¶ 58 Reversed with directions; mandate to issue immediately.